NEAL RUGGLES

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

1. RAILROADS—*powers and privileges of consolidated companies.* A consolidated railroad company, formed under legislative sanction, succeeds to all the rights conferred upon the several companies thus united, by their respective charters, but it is not invested with any greater or other rights than were possessed by the constituent companies forming the consolidated organization.

2. SAME—*charters are contracts protected by the Federal constitution.* The charter of a railway corporation is a contract between it and the State, that it may exercise the rights and privileges conferred until the expiration of the charter, unless, by some act violative of the obligations assumed, it shall forfeit its privileges and franchises, and, under the Federal constitution, the obligation of such contract can not be impaired by subsequent legislation.

3. SAME—*extent of grant of right to fix tolls, etc.* An express grant of power in a charter of a railway company to fix the rates of tolls to be charged, and to alter and change the same, does not confer unlimited power, but only the right to charge reasonable rates, and what is a reasonable maximum rate may be fixed by statute.

4. CONSTITUTIONAL LAW—*legislative power.* The legislature of a State may exercise all power not conferred on the general government, or which is not prohibited by constitutional limitation.

5. SAME—*corporation subject to police power of State.* It has been repeatedly held by this court, that corporations created within the State are amenable to the police power of the State to the same extent as are natural persons, but to no greater extent. The legislature may require of these bodies the performance of any and all acts, which they are capable of performing, that it may require of natural persons.

6. SAME—*legislative control over corporations to protect public.* The legislature of this State has the power, under the constitution, to fix a maximum rate

of charges by individuals as common carriers, warehousemen, or others exercising a calling or business public in its character, or in which the public have an interest to be protected against extortion or oppression, and it has the same rightful power in respect to corporations exercising the same business, and such regulation does not impair the obligation of the contract in their charters.

7. The act of the General Assembly entitled "An act to establish a reasonable maximum rate of charges for the transportation of passengers on railroads in this State," approved April 17, 1871, is not unconstitutional, but is a valid law.

APPEAL from the Circuit Court of Bureau county; the Hon. EDWIN S. LELAND, Judge, presiding.

It was agreed in the court below that the following statement of facts are and shall be taken as true:

"It is stipulated and agreed by and between the parties to this suit, that the same shall be tried by the court, without the intervention of a jury, upon the following facts, and the law governing the same, to-wit: On the seventh day of March, A. D. 1873, Morgan A. Lewis, the complaining witness in this cause, got on board the regular mail passenger train of the Chicago, Burlington and Quincy railroad, at Buda, in the county of Bureau, to go to Neponset, a station on the line of said railroad six miles west of Buda; that said train started, and defendant, Neal Ruggles, who was the regular conductor of said train, demanded of Lewis a ticket, or his regular fare in cash, as established by said railroad company; that said Lewis had no ticket, but immediately tendered to defendant, as such conductor, the sum of eighteen (18) cents, (being three (3) cents per mile from said Buda to Neponset,) which the defendant refused to accept, but demanded of said Lewis the sum of twenty (20) cents, which was the regular fare charged by said railroad between said points, and which had been fixed by the board of directors and officers of said railroad company several years prior thereto, and which said sum of twenty (20) cents was charged to and paid by all passengers traveling between said places on said railroad. Lewis refused to pay more than eighteen (18) cents; thereupon the defendant stopped his

17—91 ILL.

train before it had left the station at Buda, and requested said Lewis to leave the train, which he refused to do, claiming that, under the law of the State of Illinois entitled 'An act to establish a reasonable maximum rate of charges for the transportation of passengers on railroads in this State,' approved April 15, 1871, he had a right to go and be carried from Buda to Neponset for said sum of eighteen (18) cents, when defendant, denying such right, attempted to remove said Lewis from the cars, and took hold of him for that purpose, and attempted to force and expel him therefrom (but used no unnecessary force in said attempt), but failed; thereupon said Lewis, after his arrival at Neponset, caused said defendant to be arrested for assault and battery in attempting to remove him (the said Lewis) from the cars, and on the 20th day of March, A. D. 1873, the defendant was tried before Thomas Rhodes, Esq., a justice of the peace at Neponset, in said Bureau county, and fined $10 and costs, from which judgment the defendant took an appeal to this court.

" It is further admitted and agreed, that the said Chicago, Burlington and Quincy Railroad Company is a corporation situated in and created by the laws of the State of Illinois, and owns and operates a railroad between Chicago, on Lake Michigan, in said State, and East Burlington and Quincy, on the Mississippi river, and that it is composed of the Aurora Branch railroad, the Central Military Tract railroad, the Peoria and Oquawka railroad, and the Northern Cross railroad, duly consolidated by virtue of an act of the General Assembly of the State of Illinois entitled ' An act to enable railroad and plank-road companies to consolidate their stock,' approved February 28, 1854, and that a copy of these said articles of consolidation was duly filed in the office of the Secretary of State of the State of Illinois in the year 1856, in full compliance with said law.

"And it is further admitted and agreed, that said Chicago, Burlington and Quincy railroad is in and belongs to ' Class B,' of the said act entitled 'An act to establish a reasonable maxi-

mum rate of charges for the transportation of passengers on railroads in this State,' approved April 15, 1871, and in force July 1, 1871; and it is further admitted, that the ticket office at Buda was not open so that Lewis could purchase a ticket thereat, and that the said Lewis was an adult person, aged about forty years.

"Now, if the court shall find and be of opinion that the act last aforesaid was a valid and constitutional law in the matter of fixing, limiting or controlling the rates of fare to be charged by said railroad, and that said Chicago, Burlington and Quincy Railroad Company was bound to obey the same, notwithstanding the provisions of its charter, the judgment of the justice of the peace shall be affirmed, with costs; but if said court shall find and be of opinion that, as to said Chicago, Burlington and Quincy railroad, in the said matter of fixing, limiting or controlling its rate of passenger fare, the said act is invalid and unconstitutional, then the defendant shall be acquitted and discharged.

"It is further agreed, that if, upon the foregoing facts, the court shall adjudge the defendant to be guilty of said assault and battery, then this agreement shall stand in lieu of, and shall be taken and regarded as, a bill of exceptions in this case, and as embodying all of the evidence herein, and a motion for a new trial shall be regarded as having been made by the defendant and formally overruled by the court, and the defendant shall have leave to appeal said cause to the Supreme Court of Illinois, by filing a bond in the office of the clerk of this court, in the penal sum of $200, with Hiram Bigelow as surety, within twenty days after the rendition of the judgment of the court."

On this agreed state of facts the court below found in favor of the people, and rendered final judgment against defendant for a fine of $10. An appeal was allowed, and a bond, with Bigelow as surety, in the penal sum of $200, was filed, according to the terms of the stipulation. The record is brought to this court, and a reversal is urged on the ground that the act

of the General Assembly fixing the rate of fare to be paid by persons traveling on the road is unconstitutional and void.

Mr. O. H. BROWNING, Mr. B. C. COOK, and Mr. H. BIGE-LOW, for the appellant.

Mr. JAS. K. EDSALL, Attorney General, for the People.

Mr. JUSTICE WALKER delivered the opinion of the Court:

By the agreed facts in this case, the question is presented whether the act of the General Assembly entitled "An act to establish a reasonable maximum rate of charges for the transportation of passengers on railroads in this State," approved April 15, 1871, and in force July 1, 1871, is unconstitutional.

Appellant claims, and it may be conceded, that the charters of the several railroads which consolidated, under laws authorizing the same, to form the Chicago, Burlington and Quincy Railroad Company, formed contracts between those companies and the State. We apprehend this proposition will not be contested; but the nature and extent of those contracts is the subject of this dispute. We may safely assume that the present consolidated railroad succeeded to all the rights conferred by charters on the several roads thus consolidated, but it became invested with no greater or other rights than were possessed by the constituent companies forming the consolidated organization. Under those charters these companies were organized, constructed their roads, and were empowered to use and operate the same in transporting persons and property over their roads, and to fix fares and charges for the same. The charters became a contract between them and the State, that they might exercise their charter rights till the expiration of the term for which their charters were granted, unless, by some act violative of the obligations assumed by their organization, they should forfeit these privileges and their franchises; and under the constitution of the United States, the General Assembly has no power to impair the obligation of these con-

tracts, and the company formed by consolidation succeeded to these rights and privileges by that act.

But, conceding this to be true, in its fullest extent, still, the question arises whether the corporation may not be controlled in exercising its powers, by reasonable legislation, to the full extent the legislature may thus control natural persons exercising the same calling or business. The General Assembly may exercise all power not conferred on the general government, or which it is not prohibited from exercising by constitutional limitations. This being true, has the General Assembly the power to control natural persons and corporations in their business, to protect the community from oppressive, unjust and wrongful impositions in transacting their business or in performing their duties to the public?

When the General Assembly brings into existence an artificial person or corporation, it may, at pleasure, endow it with such faculties or powers as it may deem proper and for the benefit of the corporators and the public. It may grant or withhold powers at pleasure; but it is believed that body is powerless to confer greater or more unlimited powers than are possessed by natural persons. The power, however, may, no doubt, be conferred to that extent when necessary to accomplish the end sought; but it would be contrary to the very object of the creation of government, to create bodies or artificial persons beyond the power of control by the government. To create bodies in its limits beyond the governing power of the State, bodies that are only controlled by their own will, independent of law and beyond its control, would be beyond the purpose of establishing government. It has been repeatedly held by this court, that where a corporation is thus created, it becomes amenable to the police power of the State to the full extent that natural persons are subject to its control.

This doctrine was fully recognized and announced in the cases of *Ohio and Mississippi Railroad Co.* v. *McClelland*, 25 Ill. 140, *Galena and Chicago Railroad Co.* v. *Loomis*, 13 id.

548, *Galena and Chicago Railroad Co.* v. *Dill*, 22 id. 204, and has been announced in numerous subsequent cases, as applicable to the police power of the State, and is the settled doctrine of this court, and it is referable to the maxim, *salus populi suprema est lex.* It is for the protection, safety and best interests of the people that governments are instituted and maintained.

In this class of cases, as in that relating to the exercise of the police power of the State, corporate bodies are under the control of the State to the same, but to no greater extent, than individuals. The General Assembly may require of these bodies the performance of any and all acts which they are capable of performing, which they may require of individuals. If the General Assembly may fix maximum charges beyond which individuals may not go in performing services for the general public, and require them to conform to such requirements, then there can be no just reason why the General Assembly may not require the same of corporate bodies. That body may, undoubtedly, for the same reason and to accomplish the same ends, limit the power of each.

If, then, the General Assembly may fix a maximum rate of charges by individuals as common carriers, warehousemen or others exercising a calling or business public in its character or in which the public has an interest to be protected against extortion or oppression, that body may do the same thing and fix the maximum charges of corporations exercising the same business. Of this there can, we apprehend, be no doubt.

In the case of *Munn* v. *The People*, 69 Ill. 80, this court held that it was competent for the General Assembly to fix the maximum charges by individuals keeping public warehouses for storing, handling and shipping grain. And this, too, when such persons had derived no special privileges from the State, but were, as citizens of the State, exercising the business of storing and handling grain for individuals. This case was taken to the Supreme Court of the United States, and the doctrine was affirmed. See *Munn* v. *Illinois*, 94 U. S. 113.

So it may be assumed that the doctrine is fully established, that the General Assembly has such power over private persons.

That court further held, in *Chicago, Burlington and Quincy Railroad Co.* v. *Iowa,* id. 155, and *Winona and St. Paul Railroad Co.* v. *Blake,* id. 180, that the Legislature has the same control over railroad corporations. And in these cases there does not seem to have been any reservation of such power in their charters, in the constitution of the State, or in any general law. But the doctrine is placed on the general or necessary power of the State. And it was held not to violate any constitutional limitation, either State or Federal.

In the case of *Winona and St. Paul Railroad Co.* v. *Blake, supra,* there does not seem to have been any statutory or constitutional power reserved to thus regulate the charges of the company. And the original charter of the company, we infer, like that of this company, authorized that company to fix its own rate of charges. The court say that the constitutional provision that "all corporations being common carriers * * * shall be bound to carry mineral, agricultural and other productions or manufactures on equal and reasonable terms," or the act of the General Assembly of the 28th of February, 1866, providing that the "company shall be bound to carry freight and passengers upon reasonable terms," do not add anything to or take from the provisions of the original charter.

In the case of the *Chicago, Burlington and Quincy Railroad Co.* v. *Iowa, supra,* it was urged that by its charter it had the right to fix the rates of compensation for the transportation of persons and property over its road; that it could not be controlled or taken away by the Legislature of Iowa fixing a maximum rate of charges for the road. But the court held the law valid and binding, and say: "This company, in the transaction of its business, has the same rights and is subject to the same control as private individuals under the same circumstances. It may carry when called upon to do so, and can charge only a reasonable sum for the carriage. In the

absence of any legislative regulation upon the subject, the courts must decide for it, as they do for private persons, when controversies arise, what is reasonable.   But where the Legislature steps in and provides a maximum of charges, it operates upon this corporation the same that it does upon individuals engaged in a similar business.   It was within the power of the company to call upon the Legislature to fix permanently this limit, and make it a part of the charter, and if it was refused, to abstain from building the road and establishing the contemplated business.   If that had been done the charter might have presented a contract against future legislative interference, but it was not, and the company invested its capital, relying upon the good faith of the people and the wisdom and impartiality of legislators for protection against wrong under the form of legislative regulation."   This case can not be distinguished, in its principles and material facts, from the one under consideration.

Both cases involve the construction of a provision of the constitution of the United States, and that court having decided it, we must be governed by and give force to it.   It is, therefore, unnecessary to further discuss the question.

There being no error in the record, the judgment of the court below is affirmed.

*Judgment affirmed.*

Afterward, upon a petition for rehearing, the following additional opinion was filed :

Per CURIAM:   On a petition for a rehearing, it is claimed that the case of *Chicago, Burlington and Quincy R. R. Co.* v. *Iowa,* 94 U. S. 155, recognizes a distinction between a charter which is entirely silent as to the power to fix the rate of tolls, and one that authorizes the directors to fix such rate; that in the Iowa charter there was nothing contained in reference to the rates of tolls that might be charged, but it was silent on the subject. The court holds, in such a case, as we have seen, that the road could carry when called upon to do so, and could charge only

a reasonable sum for the carriage. In the absence of any leg-
islative regulation upon the subject, the courts must decide for
the corporation as they do for private individuals, when con-
troversies arise, what is reasonable. But when the Legislature
steps in and prescribes a maximum of charges, it operates upon
this corporation the same as it does upon individuals engaged
in a similar business.

Here, the court holds, if the charter is as contended, that
the corporation had the implied power to fix charges for ser-
vices rendered, but it was also held, that in fixing such rates
of charges they must be reasonable, and their reasonableness
might, like those made by individuals, be inquired into and
determined by the courts. It was also held, that in such cases,
these companies, as to such charges, were under the same leg-
islative control as individuals engaged in a similar business.
And they at the same term held, that the charges of natural
persons engaged as warehousemen in handling and storing
grain for the public, may be regulated by legislative action.

It is, however, claimed, that in this case, the General As-
sembly expressly conferred the power on the directors of the
company to fix the rates of toll to be charged, and to alter and
change the same. In this, the two cases differ. But does this
express grant change the power of control, or does it confer
unlimited power, or is the grant made with an implied limita-
tion that in fixing their rates of toll they shall be reason-
able? The fact that the grant and acceptance of the charter
constitute a contract does not solve the question. Like any
other contract it is subject to construction.

In the case of *Shields* v. *Ohio*, 95 U. S. 319, a case in its facts
very similar to this, the court gave construction to a clause in
the constitution of Ohio. It was this: "No special privileges
or immunities shall ever be granted that may not be altered,
revoked or repealed by the General Assembly." Under this
provision of the constitution, the General Assembly passed a
law prohibiting the railroad company, of which plaintiff in
error was a conductor, from charging more than three cents

a mile for carrying passengers over their road, and the company required him to charge three and a half cents. He endeavored to collect the latter sum, but the passenger refused to pay more than three cents and the conductor forcibly expelled him from the train. He was prosecuted, convicted and fined for an assault and battery, in the State courts, and the conviction was affirmed on error in the Supreme Court of the United States in that case. But in discussing the questions presented the court used this language: "The power of alteration and amendment is not without limit. The alterations must be reasonable; they must be made in good faith and be consistent with the scope and object of the act of incorporation. Sheer oppression and wrong can not be inflicted under the guise of amendment or alteration. Beyond the sphere of the reserved powers, the vested rights of property of corporations, in such cases, are surrounded by the same sanctions, and are as inviolable as in other cases."

Now if, in this broad and comprehensive reserved power to "alter, revoke or repeal," there is an implied limitation, such as this opinion holds, for the protection of the property and rights of these corporate bodies, why should not there be a similar limitation on the grant of power to fix the rate of tolls. If there be such an implied limitation on the constitutional reservation to protect corporate bodies, why not a similar limitation on the grant to the corporation for the protection of commerce, trade, business, and the rights of the people? If any possible reason can be urged for the distinction, we have been wholly unable to perceive it. In the administration of justice there can be no well founded reason for such a distinction. The same rules must apply to corporate bodies, in this regard, and to the people precisely alike. The General Assembly surely could not have intended, in granting such charters, to clothe these bodies with unlimited and uncontrolled power. Had it been so expressed in the bills for these charters, it can not be supposed they would have ever been enacted into laws. That department of government could not

have intended to grant power to oppress and wrong the community without limit or control. It is but a reasonable construction to hold that there is an implied restriction that this corporation in fixing the rates of toll shall make them reasonable. And if so, the General Assembly must have the same power to say what are reasonable maximum charges, as to do the same thing with individuals engaged in similar business or in a calling of a public character.

*Rehearing refused.*

Mr. JUSTICE DICKEY, dissenting:

The constitution of the United States provides, that no State shall pass any law impairing the obligation of contracts. Were this an open question I would hold that an express provision in the charter of a railroad company, that such corporation may fix its charges for freight and passengers, merely confers upon the corporation the function with which natural persons, acting as common carriers, are endowed without the aid of a statute; and that such provision ought not to be construed as an agreement on the part of the State, that the State will not interfere with the exercise of that function by passing acts on that subject such as it may pass and render operative upon natural persons. My view would be, that, notwithstanding such express provision in the charter, the corporation, like the natural person, is subject to the passage of all such reasonable laws as may be passed to define and punish extortion.

This, however, is a question upon which the rulings of the Supreme Court of the United States are binding authority. I understand the rulings of that court to be, that in case of such express provision in the charter, the State has contracted not to interfere by legislation with the fixing of such charges. To that authority I feel it my duty to submit.