The State Public Utilities Commission, Appellee, *vs.* The Monarch Refrigerating Company, Appellant.

*Opinion filed April 22, 1915.*

1. Public utilities—*whether a certain business is a public utility does not depend upon legislative definition.* Whether a given business or industry is a public utility depends not upon legislative definition but upon the public character of the business or service rendered, which makes its regulation a matter of public consequence and concern because it affects the whole community.

2. Same—*cold storage warehouse conducted for compensation is a public utility.* A cold storage warehouse which is conducted by the owner at fixed rates of compensation for all shippers and customers who may choose to avail themselves of the service offered is a public utility within the meaning of the Public Utilities act, and is subject to regulation as to rates of storage and other provisions for the protection of producers and shippers.

3. Same—*effect of legislative definition of word "warehouse" in section 10 of the Public Utilities act.* Considering the Public Utilities act as a whole, it is apparent that the legislature, by defining, in section 10 of said act, the word "warehouse" as including all elevators or storehouses where *grain* is stored for compensation, whether kept separate or not, did not intend thereby to exclude from the act all elevators or storehouses where commodities other than grain are stored for compensation.

4. Same—*Public Utilities Commission has power to fix reasonable rates and charges.* Section 33 of article 4 of the Public Utilities act authorizes the Public Utilities Commission to determine and fix reasonable rates and charges for all services performed by the public utilities of the State that are subject to the provisions of the act.

5. Constitutional law—*what does not render Public Utilities act invalid.* The fact the Public Utilities act defines certain words and terms used therein and explains their meaning as em-

ployed in the act does not render the act invalid as including matters not embraced in its title. (*People* v. *McBride,* 234 Ill. 146, followed.)

6. STATUTES—*when maxim "expressio unius est exclusio alterius" will not be applied.* The maxim *"expressio unius est exclusio alterius"* will not be applied, in construing a statute, to the extent of overriding a different intent therein clearly expressed.

7. SAME—*the several provisions of a statute should be construed together.* The several provisions of a statute should be construed together in the light of the general object of the act so as to give effect to the main intent and purpose of the legislature as therein expressed, and when this intention can be collected from the statute, words may be modified, altered 'or supplied so as to obviate any repugnancy or inconsistency with such intention, although in so doing particular provisions may not be read or construed according to their literal meaning.

APPEAL from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

MANCHA BRUGGEMEYER, for appellant.

EVERETT JENNINGS, (TIMOTHY F. MULLEN, and GEO. M. MORGAN, of counsel,) for appellee.

Mr. JUSTICE CRAIG delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Sangamon county affirming the order of the State Public Utilities Commission finding that appellant is a public utility within the meaning of and subject to the provisions of an act providing for the regulation of public utilities, approved June 30, 1913, (Laws of 1913, p. 460,) and requiring appellant to file with the commission and keep open for public inspection a schedule showing all rates and other charges and classifications for services performed by it in connection with its intra-State business, as provided by article 4 of the act, and particularly by sections 33 and 34 of said article, and a certain ruling of the Public Utilities Commission known as "Conference Ruling No. 12," made

267 – 34

July 2, 1914. No copy of conference ruling No. 12 is contained in the record and the reasonableness of such ruling is not before us.

Appellant's contention is (1) that the Public Utilities Commission erred in assuming appellant's business is a public utility and hence subject to regulation under the act creating said commission; (2) that the act nowhere by reasonable intendment includes appellant's said business, and that the legislature did not grant said commission the power to enter the order complained of; (3) that such powers as the commission has under the said act of 1913, relating to public utilities, are limited to fixing rates, reasonable in their nature, applicable to all who fall into the same class, which principle is wholly ignored in said order, and therefore it is unreasonable if not unlawful, and the circuit court erred in affirming the same; (4) that the act of June 30, 1913, is invalid, as to appellant's said business, for the reason that it attempts to define as well as regulate, without disclosing said intention in the title of the act, in violation of the constitution. The decision of these questions necessarily depends upon the nature of the business conducted by appellant and the construction that is to be given to the various provisions of the act in question.

It appears from the testimony of the secretary of appellant given before the commission, that the Monarch Refrigerating Company is a corporation organized under the laws of Illinois, doing a general warehouse business in the city of Chicago. It has operated for about twenty years a plant equipped and used to produce and furnish cold storage for fruits, vegetables and food and dairy products, such as poultry, eggs, cheese, butter, etc., which it receives and stores for persons residing in this State and also for shippers and producers of Iowa, Wisconsin and other States. The goods stored are subject either to the order of the persons by whom they are stored or to such other persons as may be designated by them, the return or re-delivery

of the goods stored being made wholly within the State of Illinois. Its plant covers several acres of ground and has a capacity for about 4500 car-loads of goods. It is divided into several parts or departments, with rooms in which different degrees of temperature are maintained in order to accommodate the requirements of the various food products consigned to it for storage. All goods are stored subject to the order of the owner. The ownership of the goods often changes after they are stored and sometimes changes even in the course of transit to the city of Chicago, so that appellant has no means of knowing what disposition will ultimately be made of the goods, or their final destination, at the time they are stored with it.

As we understand the record, the business of appellant consists largely, if not entirely, of receiving and storing in its warehouses the several food products above mentioned until such time as there shall be a demand for the same on the market, so that, in a sense, the goods are often in transit while in the possession of appellant. It is also apparent from the record and our common knowledge of such matters that the goods which are stored and handled by appellant are what is known as perishable, and that storage plants similar to that conducted by appellant are indispensable to the proper handling and shipment of such commodities as the business of the country is now conducted. As appellant at present conducts its business each transaction is a matter of private agreement between the parties, the rate charged being pretty well established by custom and practice and based upon the character of the services rendered and the requirements of the different commodities left with it for storage, those requiring a lower degree of temperature being required to pay a higher rate of storage. There is also a difference in the charges, according to the quantity of goods in each consignment and the season.

Section 10 of the act in question provides, in part, as follows: "The term 'public utility,' when used in this act,

means and includes every corporation, company, association, joint stock company or association, firm, partnership or individual, their lessees, trustees, or receivers appointed by any court whatsoever, (except, however, such public utilities as are or may hereafter be owned or operated by any municipality,) that now or hereafter: (*a*) May own, control, operate or manage, within the State, directly or indirectly for public use, any plant, equipment or property used or to be used for or in connection with the transportation of persons or property or the transmission of telegraph or telephone messages between points within this State; or for the production, storage, transmission, sale, delivery or furnishing of heat, cold, light, power, electricity or water; or for the conveyance of oil or gas by pipe line; or for the storage or warehousing of goods; or for the conduct of the business of a wharfinger; or that (*b*) may own or control any franchise, license, permit or right to engage in any such business." It is further provided in section 10 that "the term 'warehouse,' when used in this act, includes all elevators or storehouses where grain is stored for a compensation, whether the property stored be kept separate or not." And that "the term 'transportation of property,' when used in this act, includes any service in connection with the receipt, carriage, delivery, elevation, transfer in transit, ventilation, refrigeration, icing, storage and handling of the property transported." (Laws of 1913, pp. 465-467.)

That the legislature has the power to control and regulate businesses of the character of that conducted by appellant cannot be seriously questioned. By section 1 of article 13 of the constitution of this State it is provided that "all elevators or storehouses where grain or other property is stored for a compensation, whether the property stored be kept separate or not, are declared to be public warehouses." In *Hannah* v. *People,* 198 Ill. 77, we pointed out that the framers of the constitution deemed

the adequate protection for the producers and shippers of grain and other commodities from the wrongs, frauds and impositions that might be practiced upon them by those engaged in the business of providing storage for their products, of such importance that the same was made a matter of a special constitutional provision. In *Mayer* v. *Springer,* 192 Ill. 270, in construing this provision of the constitution, we held that while the State has made no attempt to regulate purely private business and affairs, this section of the constitution did bring under legislative control, as to rates of storage and other provision for the protection of the producers and shippers, all those public agencies, such as warehouses, where the business of receiving grain or property in store for the public for a compensation is carried on. And in *Chicago Dock Co.* v. *Garrity,* 115 Ill. 155, we held that property becomes clothed with public interest whenever it is used in such a manner as to affect the community at large, and that when one devotes his property to a use in which the public has an interest, he must submit to be controlled and regulated by the public in such use for the common good, to the extent of the interest that he has thus created for the public in the use of his property. As to what is meant by the word "public" when used in this connection, it is very difficult to define or explain it in any simpler language than by the use of the word "public" itself. The Century Dictionary thus defines the word "public:" "Of or belonging to the people at large; relating to or affecting the whole people of a State, nation or community; * * * not limited or restricted to any particular class of the community." The New International Dictionary defines it: "Of or pertaining to the people; relating to or affecting a nation, State or community at large." In 32 Cyc. 748, one of its meanings is given as "open to all the people; shared in or to be shared or participated in or enjoyed by the people at large; not limited or restricted to any particular class of the community." Used

in this latter sense it would not include those isolated instances in which a person might select a few individuals with whom he chooses to deal, but would include all those businesses or plants which were intended for and open to the use of all members of the public who may require it, to the extent that its capacity will permit of the public use. That such is the character of the business conducted by appellant is not disputed. Its warehouse and storage plant is not conducted or operated for the purpose of storing and preserving goods or merchandise purchased and owned by it, but, on the contrary, is devoted to receiving, storing and preserving goods or merchandise generally, for the public or for all who may see fit to use its plant, to the full extent or limit of its capacity. We infer that without this public patronage appellant could not maintain or operate its plant profitably, and to the extent that it has held itself out as a public warehouseman and has impressed its business with a public use it is subject to legislative control as to rates of storage and other matters within the limitations prescribed by the constitution. 40 Cyc. 402; *Hannah* v. *People, supra; Ruggles* v. *People,* 91 Ill. 256; *City of Chicago* v. *Town of Cicero,* 210 id. 290; *Munn* v. *People,* 69 id. 80; affirmed in 4 Otto, 113; *Budd* v. *State of New York,* 143 U. S. 517.

The principal question involved in the two cases last cited was the right of the legislature of a State to fix and control the charges made by the owners of grain elevators or warehouses. It was decided that the State legislature had that power because such elevators or warehouses were, in effect, public warehouses engaged in serving the public. In discussing the question as to whether or not such warehouses were amenable to State regulation, in *Munn* v. *People, supra,* (the leading case on this subject,) the United States Supreme Court pointed out that when a person becomes a member of society he parts with some of the rights or privileges which as an individual, not affected by his re-

lations to others, he might retain, and, in effect, covenants
with every other citizen, and with the whole people, that
all shall be governed by certain laws for the common good,
among which is that each citizen will so conduct himself
and so use his own property as not unnecessarily to injure
another, and that from this source the police power of the
State is derived under which the government regulates the
conduct of its citizens with one and another, and the man-
ner in which each shall use his own property, when such
regulation becomes a matter of public consequence or nec-
essary for the public good.   It was further said in the opin-
ion: "In the exercise of this power it has been customary
in England from time immemorial, and in this country
from its first colonization, to regulate ferries, common car-
riers, hackmen, bakers, millers, wharfingers, inn-keepers,
etc., and in so doing to fix a maximum charge to be made
for services rendered, accommodations furnished and arti-
cles sold.   *   *   *   Looking, then, to the common law,
from whence came the right which the constitution pro-
tects, we find that when private property is 'affected with
a public interest it ceases to be *juris privati* only.'   This
was said by Lord Chief Justice Hale more than two hun-
dred years ago in his treatise De Portibus Maris, (I Harg.
L. Tr. 78,) and has been accepted without objection as an
essential element in the law of property ever since.   Prop-
erty does become clothed with a public interest when used
in a manner to make it a public consequence and affect
the community at large.   When, therefore, one devotes his
property to a use in which the public has an interest, he,
in effect, grants to the public an interest in that use, and
must submit to be controlled by the public for the common
good to the extent of the interest he has thus created.   He
may withdraw his grant by discontinuing the use, but so
long as he maintains the use he must submit to the con-
trol."   It was there further pointed out that it was a mat-
ter of no importance that the business was one of recent

origin, for when once it was established that the business was one in which the whole public had a direct and positive interest, the case presented then was one "for the application of a long known and well established principle in social science, * * * so as to meet this new development of commercial progress," and that to do so did not constitute an attempt to compel a person to grant the public an interest in his property, but only declared his obligations to the public if he use his property in that particular manner. It was further said: "It matters not in this case that these plaintiffs in error had built their business before the regulations complained of were adopted. What they did was from the beginning subject to the power of the body politic to require them to conform to such regulations as might be established by the proper authorities for the common good. They entered upon their business and provided themselves with the means to carry it on subject to this condition. If they did not wish to submit themselves to such interference they should not have clothed the public with an interest in their concerns. The same principle applies to them that does to the proprietor of a hackney carriage, and as to him it has never been supposed that he was exempt from regulating statutes or ordinances because he had purchased his horses and carriage and established his business before the statute or the ordinance was adopted."

As has been stated, the decision in this case depended upon whether or not the business sought to be regulated was, in fact, a public business, or what might now be termed a public utility. The courts decided that grain elevators and warehouses for handling grain were subject to regulation, not because they had been declared by law to be public warehouses and so subject to regulation, but because they were, in fact, public warehouses and proper subjects for statutory regulation. When the law first assumed the regulation of those lines of business which were of a public nature they were not nearly as numerous or important

as at the present time.  They included inns, common car-
riers and wharves.  In our own State at an early day the
legislature enacted laws fixing the charges and otherwise
regulating such lines of business.  It is clear from the his-
tory of legislation on this subject, culminating in the pas-
sage of the act of 1913, and from the construction placed
by the courts on legislation previously enacted, as shown
by an unbroken line of authorities, that the regulation of
so-called public utilities has kept pace with invention, the
increase of population and the demands of civilization that
have been brought about by the changing order of things.
Within the memory of man railroads and telegraphs have
come into use in this State.  With the railroads, elevators
or grain warehouses came into use as necessary adjuncts in
handling the grain which was a large and important part
of the freight carried by the railroads.  In the course of
events the city of Chicago became the converging point for
many railroads which carried the products of Illinois and
of the other great agricultural States of the west and north-
west.  At Chicago some of this grain was used, but much
of it was transferred to other railroads or to vessels tra-
versing the Great Lakes for shipment to the east.  As a
necessary means of handling this grain, large elevators or
grain warehouses were established at Chicago.  When the
constitution of 1870 was adopted it was seen fit to include
these elevators and warehouses among the public utilities
of that day.  By reason of the great development of the
country the city of Chicago has become one of the great-
est receiving and distributing points in the world for many
kinds of products, including the class of commodities
handled by appellant.  The railroad lines have grown into
great systems, with many different kinds of service that
were unknown in 1870.  Refrigerating and cold storage
plants have, among other things, come into general use.
When the entire act under consideration is read and its
general purpose considered, it is very plain that the legis-

lature intended to bring under the law every business which could be properly classed as a public utility. The act not only confers upon the State Public Utilities Commission which is provided for in the act, all the powers and duties theretofore exercised by the Board of Railroad and Warehouse Commissioners, but specifically names and includes every other business of a public nature which is subject to regulation as a public utility. It is inconceivable that it was intended by the legislature to leave out, as not subject to regulation, any business in this State which might be termed a public utility. This being true, the principal question before us is whether or not the business of appellant is such that we would be justified in terming it a public utility.

. In the case of *Cawper* v. *Meyer,* 147 Wis. 320, (133 N. W. Rep. 157, 37 L. R. A. [N. S.] 510,) it was held that a building owner does not come within the meaning of a statute constituting a public utility everyone who shall furnish heat, light or power, either directly or indirectly, to or for the public, by furnishing heat, light and power to his own tenant and selling the surplus to three neighbors. The holding in that case well illustrates the difference between a mere private business and one which holds itself out to supply all comers or the public up to its capacity. It is a matter of common knowledge that the cold storage business as now conducted and as cold storage plants are equipped is of recent origin. By reason of the invention and general use of refrigerator cars it is now possible to transport fruit, vegetables and dairy products and other perishable commodities over long distances. For the proper handling and marketing of these products cold storage plants similar to that conducted by appellant are absolutely necessary. The nature and volume of business conducted by appellant is such that it offers the use of its plant, up to the limit of its capacity, to all shippers and producers handling perishable goods in or through the city

of Chicago, some of the products handled coming from States as far distant as California, as shown by the evidence. It seems quite clear that if the business of the miller, the baker, the inn-keeper, the wharfinger and the hackman or cartman, who pursue a public employment, and that of the common carrier who brings the product of the producer from distant parts or foreign States to the plant of appellant for storage, is impressed with a public use to the extent that such business is subject to legislative control, then this appellant, which performs an equal or greater public service in receiving and storing such products, is likewise subject to legislative supervision and control with respect to the public service which it renders or performs. Adequate storage facilities for the storage of goods at the place of destination are equally as important to the producer and the consumer as the means by which the goods are transported to such point. In fact, with the class of perishable products handled by appellant such service is indispensable. The shipper doing business with appellant will ordinarily use, among other public utilities, the telegraph, telephone, railroads, fast freight lines, refrigerator cars and the storage facilities furnished by appellant. Can it be said that there is any material distinction in the service rendered by any of these different agencies or that any one of them is not fully a public utility? Both those engaged in carrying and those engaged in the storing of the goods alike render a public service and are therefore subject to legislative supervision and control. We could no more do without such agencies than we could do without the railroads or the telegraph or the telephone, and the public is interested in their proper regulation.

Appellant lays stress on that portion of section 10 which reads: "The term 'warehouse,' when used in this act, includes all elevators or storehouses where grain is stored for a compensation, whether the property stored be kept separate or not." The argument is, that because the legislature

uses the word "grain" instead of "goods" when it says that the term "warehouse" shall include all elevators or storehouses where *grain* is stored, etc., the express mention of the word "grain" in connection with the words "elevators or storehouses" is an exclusion of all other elevators or storehouses where any other property, goods or commodity is stored, under the rule that the express mention of one thing is an exclusion of all others. With this contention we do not agree. The maxim, *"expressio unius est exclusio alterius,"* should never be followed to the extent of overriding a different intent clearly expressed. (*Gaddis* v. *Richland County,* 92 Ill. 119; *Helm* v. *City of Grayville,* 224 id. 274.) To give this act the construction contended for by appellant and limit the jurisdiction of the commission to those public agencies which are engaged in storing grain would render the law, in some of its most essential provisions, wholly meaningless and inoperative. Such a construction is to be avoided. It is well settled that in construing statutes the intention of the legislature will control; (*Hogan* v. *Akin,* 181 Ill. 448; *People* v. *Harrison,* 191 id. 257; *Hoyne* v. *Danisch,* 264 id. 467;) that the several provisions of the statute should be construed together in the light of the general purpose and object of the act and so as to give effect to the main intent and purpose of the legislature as therein expressed. When this intention can be collected from the statute, words may be modified, altered or supplied so as to obviate any repugnancy or inconsistency with such intention, although in so doing particular provisions may not be read or construed according to their literal reading. (*Krome* v. *Halbert,* 263 Ill. 172; *Hoyne* v. *Danisch, supra.*) Appellant overlooks the fact that the business of appellant could well come under the term "public utility," as used in the act, aside from any mention of warehouses therein. It is obvious when the several provisions of this act are considered, that when the legislature provided that the term "warehouse" should include all ele-

vators or storehouses where grain is stored for a compensation, whether kept separate or not, it did not intend to thereby exclude from its provisions all other elevators or warehouses where other goods or commodities are stored for compensation. By providing that the term should include grain, whether kept separate or not, the legislature evidently intended to enlarge, instead of limit, the well understood meaning of this term. That such was the intention we think is very clear from the mentioning of the businesses in other provisions of that section which are to be deemed included within the meaning of the terms "public utility" and "transportation of property" as used in the act. Laws of this character should be given such a construction as will give effect to their true intent and meaning, without resorting to technical and arbitrary rules of construction to defeat their very object and purpose. The object of this law is clearly indicated. It was intended to include those, and only those, businesses therein mentioned which furnish storage or other service to or for the public. Whether or not a business is of that public nature must necessarily depend upon the peculiar facts and circumstances of each case, and upon the provisions of the statute read in the light of such particular facts and circumstances. We think it clear that the facts and circumstances of this case bring the business of appellant within both the letter and the spirit of the statute, and that it is therefore subject to the jurisdiction and rules and regulations of the commission.

What we have said disposes of the first two points made by appellant. As to the third contention of appellant, as to the question of the reasonableness of rates and that the commission has the power only to fix reasonable rates of a nature applicable alike to all who fall in the same class, no rates or charges have so far been fixed by the Public Utilities Commission applying to the business of appellant, so far as shown by the record. It is true that the

order of the commission compelling appellant to file its schedule of rates and charges may or may not be preliminary to such an order. When filed, such schedule may be entirely satisfactory to the commission and all parties concerned and may never be questioned. When rates are attempted to be fixed by the commission and the question of their reasonableness and applicability to all alike who fall in the same class is raised by someone interested and entitled to raise it, it will be time enough to consider and decide that question. It is not presented for decision by this record and need not be further considered at this time.

It is further insisted that the legislature has not fixed the rates which public utilities may charge nor delegated that power to the commission. In making this contention we think appellant must have entirely overlooked the provisions of section 33, article 4, of the act, which, among other things, provides: "Every public utility shall file with and as a part of such schedule and shall state separately all rules, regulations, terminal, icing, storage or other charges, privileges and contracts that in any manner affect the rates charged or to be charged for any service. Such schedule shall be filed for all services performed wholly or partly within this State, and the rates and other charges and classification shall not, without the consent of the commission, exceed those in effect on July 1, 1913. But nothing in this section shall prevent the commission from approving or fixing rates or other charges or classifications from time to time, in excess of or less than those shown by said schedules." This fully authorizes the commission to determine and fix reasonable rates and charges for all services performed by the public utilities of this State that are subject to the provisions of the act.

It is lastly contended that the act is in conflict with section 13 of article 4 of the constitution, which provides that no act hereafter passed shall embrace more than one subject, which shall be expressed in the title. The title of

the act is, "An act to provide for the regulation of public utilities," and it is insisted that as the act defines certain words and terms as therein used and explains their meaning as employed in the act, the act includes matters not embraced in its title. This contention is fully met and answered in *People* v. *McBride,* 234 Ill. 146, where a similar objection was urged to the Local Option law, which defined certain words or terms and explained their meaning as used in that act. What is there said is conclusive of the objection here urged.

Nor do we think, as is contended by appellant, that the act defines or creates businesses or industries public utilities that were not recognized as such before the act was passed. The act does not attempt to define a public utility, but, on the contrary, designates the classes of public utilities that are to be held embraced within the meaning of the act and subject to its provisions. Whether a given business, industry or service rendered is a public utility depends not upon legislative definition but upon the particular facts and circumstances in each case. It is the nature of the business or service rendered,—its public character,— that makes its regulation a matter of public consequence or concern because it affects the whole community,—that stamps it with such a public interest that it is properly subject to legislative supervision and control. The legislative declaration that a certain business shall be deemed a public utility would not make it such, if, in fact, the business as conducted is not impressed with a public use or carried on for the public benefit. The act does not create, but only regulates, existing public utilities.

For the reasons given, the judgment of the circuit court of Sangamon county will be affirmed.

*Judgment affirmed.*