(No. 45274. )

ILLINOIS-INDIANA CABLE TELEVISION ASSOCIA-
TION, Appellee, v. ILLINOIS COMMERCE COM-
MISSION, Appellant.—CABLE TELEVISION COM-
PANY OF ILLINOIS *et al.*, Appellants, v. ILLI-
NOIS COMMERCE COMMISSION, Appellee.

*Opinion filed October 1, 1973.*

WILLIAM J. SCOTT, Attorney General, PETER A.
FASSEAS, Special Assistant Attorney General, and
JAMES R. SULLIVAN, Assistant Attorney General, all
of Springfield, and ROLAND S. HOMET, JR., Special
Counsel, of Washington, D.C., for Illinois Commerce
Commission, appellant and appellee.

RICHARD R. ZUKOWSKI, of Crystal Lake (ZU-
KOWSKI, ZUKOWSIKI & POPER, of counsel), appellee

Illinois-Indiana Cable Television Association, and for appellants Cable Television Company of Illinois *et al.*

RICHARD L. CURRY, Corporation Counsel, of Chicago (WILLIAM R. QUINLAN and RICHARD F. FRIEDMAN, Assistants Corporation Counsel), for *amicus curiae* City of Chicago.

MR. JUSTICE DAVIS delivered the opinion of the court:

The Illinois Commerce Commission initiated proceedings to determine if it should exercise regulatory jurisdiction under authority granted by "An Act concerning public utilities" (hereinafter referred to as the Public Utilities Act) (Ill. Rev. Stat. 1971, ch. 111 2/3, par. 1 *et seq.*) over community antenna television systems, commonly called CATV or cable television. After extensive hearings, the Commission concluded that cable television was a public utility within the definition of section 10.3(b) of the Act and by its interim opinion and order asserted jurisdiction to regulate the industry.

The Illinois-Indiana Cable Television Association (hereinafter referred to as the Association) appealed from this order to the circuit court of McHenry County. At the same time a number of cable television companies petitioned the same court for a declaratory judgment that the Commission had no authority to regulate cable television systems.

The trial court consolidated the two cases and indicated that, based upon judicial convenience, it would be more appropriate to determine the principal issue in the administrative review proceeding. The court pointed out that the record in the administrative review proceeding was extensive, and a determination in that proceeding rather than a possible ruling based upon a more narrow, limited, or procedural ruling in the declaratory judgment action was desirable.

The trial court thus granted the Commission's motion to dismiss the petition in the declaratory judgment proceeding. An appeal was taken from that order. The trial court also reversed the interim order of the Commission in the administrative review proceeding, thus holding that the Commission had erred in assuming regulatory jurisdiction over cable television. An appeal also was taken from that order. Both appeals were allowed directly to this court under Supreme Court Rule 302(b) (Ill. Rev. Stat. 1971, ch. 110A, par. 302(b)) and were consolidated for determination.

The central issue is whether cable television is a public utility under the statutory definition contained in section 10.3 of the Public Utilities Act. Ill. Rev. Stat. 1971, ch. 111 2/3, par. 10.3.

The Illinois Commerce Commission has only that jurisdiction conferred upon it by the legislature. (*Lambdin v. Commerce Com. (1933), 352 Ill. 104, 106.*) It may not extend its jurisdiction, that being a prerogative of the legislature. Thus, if cable television is not within the statutory definition of a public utility, the Commission is without power to assume jurisdiction over such services.

The relevant portions of section 10.3 of the Act are as follows:

> " '*Public utility*' *means and includes every corporation, company, association, joint stock company or association, firm, partnership or individual, their lessees, trustees,* or receivers appointed by any court whatsoever *that owns, controls, operates or manages,* within this State, directly or indirectly, for public use, *any plant, equipment or property used or to be used for or in connection with, or owns or controls any franchise, license, permit or right to engage in:*
> * * *
> *b. The transmission of telegraph or telephone messages* between points within this State;
> * * *." (Emphasis ours.)

The Commission made the following relevant findings after conducting extensive hearings:

"1. Cable television is a system of delivery of television signals over a grid of coaxial cables possessing a broad frequency bandwidth, which system can also deliver a variety of other video, audio, and data-grade signals. The system as a whole is properly termed 'broadband cable communications.'

\* \* \*

3. The business of providing cable television and other forms of broadband cable communications is an engagement 'for public use' in 'the transmission of telegraph or telephone messages within this State', within the meaning of Section 10—3(b) of the Public Utilities Act, Ill. Rev. Stats., Ch. 111 2/3, Sec. 1 et seq.

(a) As a matter of practical construction, 'telephone' service within the meaning of the statute has come to mean a total telecommunications service embracing narrowband and broadband transmission of a wide variety of video, audio, and data-grade messages including television signals.

(b) There is at present a significant service overlap between the offerings of cable television and telephone companies, restrained from full competitive realization by a federal antitrust consent decree entered into by the Bell System and by a cease-and-desist regulation of the Federal Communications Commission affecting independent telephone companies. Neither of these legal restraints is immutable, and present federal policy favors the development of regulated competition for the total telecommunications service each industry is or can become technically equipped to provide.

(c) The huge financial needs of the cable television industry, if it is to meet the objective of wiring the cities and towns of America over the coming decade, will require the adoption of financing techniques similar to those employed by the conventional telephone industry; namely, the floating of high-rated, long-term utility securities.

(d) The methods of operation of the two industries are closely comparable. Both offer a mix of analogue and digital communications.

Both have evolved and are evolving from reliance on one dominant medium of transmission to employment of a combination of coaxial cable, wire, and microwave. And the trend in both industries has been and is from the initial offering of party-line service to the development of switched services."

The Commission argues that its findings of fact are to be accepted by this court if supported by substantial evidence, citing section 68 of the Act (Ill. Rev. Stat. 1971, ch. 111 2/3, par. 72). We agree insofar as the contention relates to facts respecting the nature and elements of cable television and its industry. The statutory interpretation of the meaning of the terms "telegraph or telephone messages" is a question of law for determination by the courts. (*Anderson v. City of Park Ridge (1947), 396 Ill. 235; Dwyer v. Dwyer (1937), 366 Ill. 630, 634.*) Insofar as the facts found by the Commission are relevant to this determination, they should be considered by the courts. The legal question of the meaning of the words used in the statute is better determined in light of the particular factual setting than in a void. *State Public Utilities Com. v. Monarch Refrigerating Co. (1915), 267 Ill. 528, 541.*

The question of whether the words "telephone or telegraph" as used in the statute can encompass cable television is one of first impression in this State. Similar statutes, however, have been interpreted by the highest courts in other States. In *Television Transmission, Inc. v. Public Utilities Com. (1956), 47 Cal. 2d 82, 301 P.2d 862,* the California Supreme Court had before it the question of whether a cable television system was a public utility under the California constitution and the California Public Utilities Code. The California constitution provided in part: "Every private corporation *** owning, operating, managing, or controlling any *** plant or equipment within this State for *** the transmission of telephone or telegraph messages *** either directly or indirectly, to or for the public *** is hereby declared to be a public utility

subject to such control and regulation by the *** Commission as may be provided by the Legislature, and every class of private corporations *** hereafter declared by the Legislature to be public utilities shall likewise be subject to such control and regulation." (Cal. Const. art. XII, sec. 23.) The California legislature further provided that: " 'Public utility' includes every *** telephone corporation, telegraph corporation *** where the service is performed for or the commodity delivered to the public or any portion thereof." See 47 Cal. 2d 82, 85, 301 P.2d 862, 863.

In the California case the cable television company involved in the litigation serviced about 950 television sets. It maintained an antenna at a high elevation to receive available television signals and transmitted signals through a coaxial cable strung on poles owned by utility companies. The cable television company paid the utility companies a fixed charge per pole per year for this service.

The California Public Utilities Commission found that the cable television company operated as a telephone corporation and was, therefore, subject to its jurisdiction. The court stated that the use of poles, wires and cable in connection with communication did not render the company a telephone corporation unless the use of such facilities was to facilitate communication "by telephone." The word, "telephone" was not defined in the statute.

The California commission urged to the court that television was merely an advanced form of telephony, the art of reproducing sounds at a distance. The court answered:

> "It is true that television and telephone have in common the transmission of voices, for sounds, including voices, usually accompany the pictures of the persons or things televised. Not only are the methods of transmission different in each art, however, but in telephony one may carry on a two-way communication by speaking as well as

listening, and pictures of speaker and listener do not yet form a part of the communication. See Re Edwin Bennett, 89 P.U.R. (N.S.) 149, 150. Telegraphy differs from both in that ordinarily neither voices nor pictures are transmitted. Each may have in common the use of electricity, conduits, ducts, poles, wires, cables, instruments, appliances, et cetera, but no one of them includes all of the features of the others. Furthermore, the service by television as well as radio is more akin to that of music halls, theaters, and newspapers than it is to that of either telephone or telegraph corporations." 47 Cal. 2d 82, 88, 301 P.2d 862, 865.

The court relied upon the common understanding of the words as used in the field of communications and stated, "In common understanding telephone, telegraph, radio, and television corporations are each different from the other, and until the Legislature otherwise provides we must so regard them." 47 Cal. 2d 82, 87, 301 P.2d 862, 864.

The second closely analogous case is *Minnesota Microwave, Inc. v. Public Service Com. (1971), 291 Minn. 241, 190 N.W.2d 661.* The case did not involve a cable television system, but, rather, the use of unidirectional, closed-circuit microwave facilities to transmit television signals from the Minneapolis campus of the University of Minnesota to the Rochester, Minnesota, campus. The court held that the question was whether the company supplying this service was supplying a "telephone service." Both the Minnesota Public Service Commission and the Minnesota trial court answered that question affirmatively.

The Minnesota statute did not define the term "telephone service." The Minnesota Supreme Court first observed that the interpretation of the statute, in defining the meaning of "telephone service," was a question of law to be determined on the basis of operative facts deter-

mined by the Public Service Commission. The Public Service Commission had urged that notwithstanding the fact that this was a question of law its interpretation—that "telephone service" as used in the statute was a broad term to be construed in the light of the development of the arts of telephony—must be given great weight. The Commission had concluded that the transmission of television signals was one of the advancements in the field of telephony and was thus within the definition of the statutory words. The Minnesota Supreme Court rejected that contention, saying:

> "While it is undoubtedly true that administrative interpretations may in certain instances be entitled to great weight, it is clear that such is not here the case. The statutory language here under consideration is not exceedingly technical in nature, such that only specialized agencies may be thought able to understand it. Instead, the statute is phrased in common terms, and thus affords no good reason for deferring to administrative expertise for its interpretation. Moreover, the fact that the question now before this court is one which the agency has not had occasion to consider prior to the instant case weighs against placing much weight on the commission's interpretation." 291 Minn. 241, 245, 190 N.W.2d 661, 665.

The court referred to judicial interpretations of the term "telephone services" for the purpose of regulatory statutes as suggesting a more restrictive meaning than that found in a dictionary, and that it referred, for the most part, to supplying of facilities for two-way communications. (291 Minn. at 246-247, 190 N.W.2d at 665.) It noted that the question of whether CATV services constituted "telephone services" had not been answered by it but that it appeared under Minnesota law that such services would not be subject to regulations by the Public Service Commission as a "telephone company." Citing a

1965 opinion of the Attorney General of Minnesota, the court quoted that CATV companies "operate under different methods of transmission than telephone companies, and perform different services." (291 Minn. at 248, 190 N.W.2d at 666.) The court noted that both CATV and the system before it involved only one-way transmission and made the very homely observation, "Moreover, on its face, the proposed transmission system simply does not look like what the legislature must have considered as telephone service." 291 Minn. at 248, 190 N.W.2d at 666.

The court concluded with an analysis of closed-circuit television that would be equally applicable to cable television. It stated that the field "is a rapidly developing field, in which the operative considerations are likely to be quite different from those involved in providing general telephone service to the public. The legislature may consider what need there is, if any, for state regulation of companies such as appellant and act accordingly. Development of such a regulatory scheme should be left to the legislature and not merely assumed by the Public Service Commission on its own behalf." 291 Minn. at 250, 190 N.W.2d at 667.

The Commission here challenges the foregoing cases as being distinguishable. First, it argues that the California case dealt with the word "corporation" whereas the operative word in the Illinois act is "messages." That just is not so. The critical word in each case is "telephone." Further, the California constitution defined public utilities with regard to corporations engaged in the transmission of "telephone *** messages." The same argument is advanced with respect to the Minnesota case, but it is abundantly clear that the court there was concerned with the interpretation of the statutory language "telephone service." The courts in both cases looked to the nature of the service provided as the critical factor in reaching their determinations.

The Commission correctly points out that both cases

were determined without the benefit of substantial factual determinations by the respective State commissions, and, particularly with respect to the California case, that cable television has developed considerably since the date of that determination. We do not believe, however, that either factor detracts greatly from the persuasiveness of these cases. While cable television has changed in many respects, still, in common understanding, telephone and television differ from one another. The service provided by cable television, basically the providing of television signals to subscribers, differs greatly from the nature of service provided by telephones. It does not seem to us that the transmitting cable, and whatever similarities there might be in such transmission, are as important in ascribing a meaning to the statutory use of the word "telephone" as the basic character of service provided and utilized with regard to a telephone, as opposed to cable television.

It is true that the instant case reaches this court with a more fully developed factual background, but the Commission's factual findings do not dissuade us from the rationale of the above cases. The Commission's findings describe the basic cable television operation and observe that technology has been developed to deliver many more channels over the cable, including some which carry locally originated signals, and to provide a return path for certain limited type signals. The expansion of channel capacity and versatility was found to present new, untapped sources of services and revenue. The Commission suggests that among a myriad of untapped sources of revenue now available with new developments are the leasing of channels to community groups, neighborhood advertisers, and local and national programmers who now have no access to conventional television broadcasting. Another possibility is pay cable television of such things as major sporting events and cultural offerings.

The Commission additionally found that the services offered by telephone companies also have expanded

greatly beyond that originally available. It found further that the methods of operation in the two industries were closely parallel. There are two basic types of wired communication: analogue and digital. Voice telephone communications are analogue; telegraph signals are digital. Telephone companies also now engage in digital communications, high-speed data transmission being an example of the latter. Cable television companies engage in analogue communications—the transmission of voice and pictures by cable—, but it is anticipated that they too will provide digital communications in the future. The methods of transmitting messages are similar. Telephone service started as a party-line service but is now switched, individual-to-individual service. Cable television has the technical capacity also to provide switched services.

The Commission's findings show similarity between cable television and telephone in the basic mode of operation and, perhaps, in the nature of development of the industry. More important, however, these findings illustrate the vast difference in the basic nature of the services performed by each. The potentials suggested for cable television such as leasing channels to community groups, to programmers who do not now have access to conventional television broadcasting, and pay cable television for major sporting and cultural events make more cogent the observation of the California court that service by television as well as radio is more akin to that of theaters, music halls and newspapers than to telephones.

The Commission relies upon *State Public Utilities Com. v. Monarch Refrigerating Co. (1915), 267 Ill. 528,* mainly as holding that the legislature intended a broad coverage under its definition of public utilities. Monarch was engaged in the general warehousing and storage business. It provided cold storage for fruits, vegetables, food and dairy products. The Public Utilities Act provided that the term "public utility" included every company maintaining property for the storage or furnishing of cold

and "for the storage or warehousing of goods." The Act further provided that the term "warehouse," when used in the Act, "includes all elevators or storehouses where grain is stored for a compensation."

Monarch contended that under the Act only grain warehouses were public utilities. The court, quite properly it seems, refused to read such a limitation into the Act. It stated that in adding the reference to grain the legislature intended to enlarge, rather than limit, the meaning of "warehouse." The court said that from a consideration of the entire Act and its general purpose, the legislature intended to bring under the law every business which could be properly classed a public utility. (267 Ill. at 538-539.) The court further observed, "The act does not attempt to define a public utility, but, on the contrary, designates the classes of public utilities that are to be held embraced within the meaning of the act and subject to its provisions." 267 Ill. at 543.

The Commission also relies upon *State Public Utilities Com. ex rel. Chicago Telephone Co. v. Postal Telegraph-Cable Co. (1918), 285 Ill. 411,* as suggesting that as the telephone and telegraph are interchangeable because both transmit messages between distant places by means of a current of electricity over a wire circuit so should cable television be equated to the telephone. Without conceding the correctness of equating the telephone and the telegraph, we do not believe that the case justifies the analogy drawn by the Commission. The court, in *Postal Telegraph,* in referring to the telephone and the telegraph, pointed out that whichever form of communication was employed, "substantially the same public function is performed in substantially the same way." (285 Ill. at 414.) The same public function is not performed by cable television. Just as the telephone and the telegraph provide as their function the communication of messages between their users, cable television does not have as its essential

function a means of providing communication between its subscribers.

Mr. Justice Carter, in dissenting in the *Postal Telegraph* case, disagreed with the majority's conclusion that the legislature had not recognized the distinction between telephone and telegraph companies by its separate reference in the statute. He noted from articles and cases that there were numerous similarities between the two but also well-defined differences, including the manner in which the companies transact business with their patrons and the facilities they furnish. He related that telegraph companies were as distinct from telephone companies as were railroad companies from a steamboat company, or, as might be added, an airline company.

In *United States v. Southwestern Cable Co. (1968), 392 U.S. 157, 20 L. Ed. 2d 1001, 88 S. Ct. 1994,* the Supreme Court had before it the question of Federal Communications Commission authority over CATV under the Federal Communications Act of 1934 (48 Stat. 1064, 47 U.S.C.A. sec. 151). The court stated that CATV systems perform either or both of two functions. First, they supplement broadcasting by facilitating satisfactory reception of local stations in adjacent areas where reception would not otherwise be available; and second they transmit to subscribers, or customers, signals of distant stations entirely beyond the range of local antennae. As the number and size of CATV systems have increased, their principal function has more frequently become the importation of distant signals. 392 U.S. at 163, 20 L. Ed. 2d at 1008.

The Federal Communications Act before the United States Supreme Court purported to be applicable to "all interstate and foreign communications by wire or radio." The Supreme Court experienced little difficulty in finding that CATV systems are within the scope of "all *** communication by wire or radio." 392 U.S. at 172.

The *Southwestern Cable* case is significant in two respects. It describes the functions of cable television in terms we believe distinct from those of telephone. Second, the Federal Communications Act did not contain explicit authority to regulate cable television and yet authority was so extended. But the extension of such authority was justified by the *statutory language* encompassing "all interstate and foreign communication by wire or radio," and this language was fortified by the legislative history suggesting that the Commission was to have "regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio." See 392 U.S. at 168, 20 L. Ed. 2d at 1010-1011.

Similarly, in *Springfield Television, Inc. v. City of Springfield (8th Cir. 1972), 462 F.2d 21,* the court was considering the question, among others, of defining a CATV system as a "public utility" under the Missouri laws. The court recognized that there were court decisions holding that CATV systems were public utilities and others holding that such systems were not public utilities. It noted that "each of these decisions turns on the statutory language involved defining a 'public utility.' " (462 F.2d at 25-26.) The Missouri statute defined public utilities as "every common carrier, pipe line corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, heat or refrigerating corporation, and sewer corporation ***." (462 F.2d at 25.) The court then stated that although a business corporation might not fall within the definition of a public utility under the State statute, it could still be considered such within the meaning of a city's charter. The city of Springfield had in its charter a definition of public utilities which stated that by way of description, but not as a limitation, "public utilities" included "public communications systems." The court stated that all it needed to decide was whether a CATV system was a "public communications system." Without great difficulty it found

that a CATV system was a public communication system.

The *Southwestern Cable* and *Springfield Television* cases best illustrate that it is the language of the statute involved which determines whether cable television is subject to its terms. We have no quarrel with those cases which hold that a "public communications system" or "all *** communication by wire or radio" would encompass cable television. It does not follow that the term "telephone service" encompasses cable television. Statutory language in the nature of the first terms above quoted would include all telecommunications services; language in the nature of the term "telephone service" does not.

The legislative history, which both parties argue supports their interpretation, seems to us to support the contention of the Association. The Public Utilities Act was first enacted in 1913. It is ludicrous to speculate as to the intention of the legislature at that time with respect to cable television, an industry which was developed in the late 1950's. Of significance, however, are the legislative enactments in 1967.

In 1967, section 10.3 of the Public Utilities Act, defining "public utilities," was amended. Insofar as the telecommunications field is concerned, the legislature left the statute unchanged, referring only to "telegraph or telephone messages." At the same session, by an enactment dated the same month, the legislature amended the Municipal Code as follows:

> "Sec. 11—42—11. The corporate authorities of each municipality may license, franchise and tax the business of operating a community antenna television system as hereinafter defined.
>
> The words 'community antenna television system' shall mean any facility which is constructed in whole or in part in, on, under or over any highway or other public place and which is operated to perform for hire the service of receiving and amplifying the signals broadcast by one or more television stations and redistributing such signals by wire, cable or other means to members of the public who subscribe to such service; except that such

definition shall not include (i) any system which serves fewer than fifty subscribers, or (ii) any system which serves only the residents of one or more apartment dwellings under common ownership, control or management, and commercial establishments located on the premises of such dwellings.

The authority hereby granted does not include authority to license, franchise or tax telephone companies subject to jurisdiction of the Illinois Commerce Commission or the Federal Communications Commission in connection with the furnishing of circuits, wires, cables, and other facilities to the operator of a community antenna television system. Added by act approved Aug. 3, 1967. L. 1967, p. 2581." Ill. Rev. Stat. 1971, ch. 24, par. 11—42—11.

In the above enactment the legislature defined CATV in terms that are not related to telephone services. Further the statute specifically excepts telephone companies subject to the jurisdiction of the Illinois Commerce Commission, even though they furnish wires or other facilities to operators of CATV systems.

In ascertaining the intent of the legislature, it is appropriate to consider both amendatory enactments and contemporaneous legislation on the same subject. (*Carey v. Elrod (1971), 49 Ill.2d 464, 471; People ex rel. Cason v. Ring (1968), 41 Ill.2d 305, 310.*) Also, it is proper to compare statutes *in pari materia* or to consider statutes on related subjects in ascertaining legislative intent. *Arnolt v. City of Highland Park (1972), 52 Ill.2d 27, 34; Spring Hill Cemetery of Danville v. Ryan (1960), 20 Ill.2d 608, 615.*

The Commission argues that the Municipal Code enactment gives to the municipalities only the power to license, franchise and tax and not the power to regulate. We have no doubt that the power to franchise and the power to license carries with it a power to regulate.

We are compelled to the conclusion that the words "telephone service" should be given their plain and commonly ascribed meanings as used in the Public Utilities Act and it would be impermissible for this court to

redefine them in the manner sought by the Commission. *Arnolt v. City of Highland Park (1972), 52 Ill.2d 27, 34; Droste v. Kerner (1966), 34 Ill.2d 495, 503; Central Television Service, Inc. v. Isaacs (1963), 27 Ill.2d 420, 428.*

If the jurisdiction of the Commission under the Public Utilities Act is to be expanded to the entire public telecommunications field, that should be done by the legislature and not by the Commission upon its own order or by this court.

Because of the determination we have reached upon consideration of the review of the administrative proceeding, we need not consider further and seperately the dismissal of the declaratory judgment case.

The judgments of the circuit court of McHenry County in causes Nos. 71-2983 and 71-2681 are affirmed.

*Judgments affirmed.*