UNITED STATES TRANSMISSION
SYSTEMS, INC.,
Petitioner-Appellant,

v.

BOARD OF ASSESSMENT APPEALS
OF the STATE OF COLORADO, and
Property Tax Administrator of the
State of Colorado, Respondents-Appel-
lees.

No. 83SA373.

Supreme Court of Colorado,
En Banc.

March 17, 1986.

Sherman & Howard, Raymond J. Turner, Denver, for petitioner-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Billy Shuman, Deputy Atty. Gen., Denver, for respondents-appellees.

LOHR, Justice.

United States Transmission Systems, Inc. (USTS) appeals from an order of the District Court for the City and County of Denver. That court affirmed a determination by the Board of Assessment Appeals (Board) that USTS was a public utility for the purpose of property taxation for the 1981 tax year and that USTS had property within this state with a valuation for assessment of $28,000 for 1981. We affirm.

## I.

Evidence presented to the Board established that during the year in question[1] USTS was a common carrier, regulated by the Federal Communications Commission (FCC), which provided long distance voice communication services within the continental United States. USTS, a wholly-

---

1. The value of a telephone company's operating property and plant for the purpose of property taxation is to be determined "as of the last day of December of each year." § 39–4–106(3)(a), 16B C.R.S. (1982). Thus, it is USTS's operations in 1980, specifically as of December 31, 1980, that are relevant in determining whether USTS was a public utility and, if so, the value of its property and plant for the purpose of imposing property taxes in 1981.

owned subsidiary of International Telephone & Telegraph Corporation (ITT), provided long distance service to approximately one hundred metropolitan areas, including the Denver metropolitan area. A USTS customer in most of these metropolitan areas, including Denver, could place a long distance call to any telephone number located in any other of these areas. In some of the areas, long distance calls could be received through USTS but could not be originated by use of USTS facilities. In 1980, USTS had twenty business customers and two residential customers in Colorado.

To complete a long distance call during the year in question, a USTS customer in the Denver area dialed[2] a particular seven-digit telephone number. The call moved along ENFIA circuits[3] leased by USTS from Mountain Bell. The call then was switched by Mountain Bell equipment from the Mountain Bell ENFIA circuits to long distance circuits owned by either AT&T or MCI and leased to USTS. These circuits transmitted the call to switching equipment in Dallas owned by USTS.

After receiving a second dial tone, the customer then dialed the area code and local number of the party being called. Finally, after hearing a third dial tone, the customer dialed a seven-digit allocation code that identified the customer for the purpose of billing. USTS's switch in Dallas routed the call either to another switch or directly to the party called, using long distance facilities owned by USTS or leased from another long distance carrier. The call then passed through the circuits of the local Bell company to the number dialed. The same process operated in reverse when a USTS subscriber elsewhere in the country placed a call to a number in Denver. All calls to and from Denver were routed through USTS's switch in Dallas.

All of the lines used by USTS in Colorado were provided by Mountain Bell, AT&T and MCI on a month-to-month basis pursuant to tariffs on file with the FCC. During 1980,

Mountain Bell made ten ENFIA lines available to USTS, and AT&T and MCI made available five long distance lines each. Circuits such as those acquired by USTS from Mountain Bell, AT&T and MCI were readily available upon the same terms and conditions, and for the same monthly charge, to any common carrier requesting them. Unless the circuits leased by USTS in Colorado were "property" within the state of Colorado—a characterization disputed by USTS—USTS had no property or rights in property within the state of Colorado for the tax year in question.

The property tax administrator, head of the state Division of Property Taxation, determined that USTS operated as a telephone company for the year in question and, thus, was a public utility for the purpose of property taxation. See §§ 39–4–101 to –110, 16B C.R.S. (1982 & 1985 Supp.) (valuation and assessment of public utilities). The administrator found that USTS had property within Colorado with an actual value of $666,700 and a value for property tax assessment of $200,000. USTS appealed that determination to the Board, arguing that USTS was not a telephone company and, therefore, not a public utility subject to unitary assessment by the state for the purpose of property taxation; that USTS did not have any property within the state of Colorado subject to valuation and taxation; and, in the event the Board concluded that USTS had property in this state, that the $200,000 valuation for assessment was excessive.

After a hearing, the Board agreed with the administrator that USTS did business in Colorado as a telephone company during the year in question and, thus, was assessable as a public utility. The Board indirectly rejected USTS's claim that it had no property in this state. However, the Board concluded that the actual value of the property—identified by the Board in its written findings simply as the "Operating property and plant of 'public utility' "—was $96,480

---

**2.** "Dialed" is technically inaccurate. Each USTS customer had to have a touch-tone telephone in order to place long distance calls through the USTS network.

**3.** ENFIA stands for Exchange Network Facilities for Interstate Access. ENFIA circuits allow access to long distance circuits simply by the dialing of a seven-digit number.

and that the valuation for assessment was $28,000. The Board ordered the administrator to reduce the assessment valuation of the property for the 1981 tax year to that latter amount.

USTS petitioned the district court for review of the Board's decision as provided for in section 39–4–109, 16B C.R.S. (1982 & 1985 Supp.). USTS argued that the Board erred by deciding that USTS was a public utility for the purpose of property taxation; that the value determined by the Board exceeded the actual value of USTS's property within the state of Colorado "inasmuch as it [USTS] has none in Colorado"; and that any attempt on the part of the state to subject USTS to property taxation under the circumstances would constitute impermissible interference with interstate commerce and therefore would violate the commerce clause in article I, section 8, of the United States Constitution. During a hearing held by the district court, the company argued further that its rights in the circuits owned by Mountain Bell, AT & T and MCI were, at most, intangible personal property and, as such, specifically exempted from property taxation by section 39–3–101(1)(i), 16B C.R.S. (1982).

The district court affirmed the decision of the Board in a written order. USTS appealed, raising the same issues.[4] We conclude that USTS was a telephone company for the year in question and, thus, a public utility for the purpose of property taxation. We also conclude that the telephone circuits leased by USTS in this state constituted intangible rights held by a public utility as part of its operating property and plant and, as such, were properly considered in determining the value of that operating property and plant by the unitary assessment method applicable to public utilities and provided a proper basis for allocation of part of that value to Colorado. Finally, we conclude that the imposition of a property tax upon USTS on the basis of such allocation does not violate the com-

merce clause. We address each of these issues in turn.

## II.

Most property within the state of Colorado is valued and assessed for property tax purposes on a county-by-county basis. However, Colorado law provides a centralized unitary method for valuing and taxing the property of public utilities. §§ 39–4–101 to –110, 16B C.R.S. (1982 & 1985 Supp.). By that method, the property tax administrator must determine the total value of the "operating property and plant" of each public utility as a unit. § 39–4–102(1), 16B C.R.S. (1982). The administrator then determines what portion of the total value is represented by the public utility's property within the state, reduces that portion of the total value to assessment value, and apportions the valuation for assessment among the several counties of the state in a proportion that fairly represents the value of the operating property and plant of the utility within each county. § 39–4–106, 16B C.R.S. (1982 & 1985 Supp.). Each county then levies a tax, based on whatever tax rate the county applies to other property within the county, on the valuation for assessment of the public utility property apportioned to the county.

For the 1981 tax year, a public utility was defined for the purposes of property taxation as

> every sole proprietorship, firm, partnership, association, company, or corporation, and the trustees or receivers thereof, whether elected or appointed, which does business in this state as a railroad company, airline company, electric company, rural electric company, telephone company, telegraph company, gas company, gas pipeline carrier company, domestic water company, pipeline company, coal slurry pipeline, or private car line company.

4. USTS filed its notice of appeal in the court of appeals. Upon motion by the appellees, we transferred jurisdiction over the appeal to this court on the grounds that the subject matter of the appeal has significant public interest and involves legal principles of major significance. §§ 13–4–109(1)(a) and (b), –110, 6 C.R.S. (1973).

Ch. 154, sec. 16, § 39–4–101, 1976 Colo. Sess. Laws 753, 759; Ch. 156, sec. 1, § 39–4–101, 1976 Colo.Sess. Laws 768, 768.[5] It is undisputed that for the 1981 tax year, USTS operated as a corporation doing business in this state. However, whether USTS was a public utility depends on whether USTS was operating as a "telephone company," the only category in the definition of public utility that arguably encompasses the activities of USTS. The term "telephone company" has not been defined in the statutes. We must assume, therefore, that the legislature intended to give the term its usual and ordinary meaning. *Transponder Corp. of Denver, Inc. v. Property Tax Administrator*, 681 P.2d 499, 503 (Colo.1984) (*Transponder*); *Cohen v. State Dept. of Revenue*, 197 Colo. 385, 388–89, 593 P.2d 957, 960 (1979).

Recently, in *Transponder*, we had reason to consider the usual and ordinary meaning of the term "telephone company," also in the context of the property taxation of public utilities. 681 P.2d at 503–04. In that case, the administrator determined that Transponder Corporation of Denver, Inc. was a telephone company and should be taxed as a public utility. Transponder appealed, and the Board affirmed the decision of the administrator. On review, the district court reversed, and we affirmed the decision of the district court. The evidence showed that Transponder owned a transmitting and receiving earth station in Jefferson County which provided a portion of a private communications channel that allowed a customer to send voice, data and video signals from that customer's Denver-area office to other offices of the customer located in seven cities across the United States. A local Mountain Bell circuit carried the signal from the customer's Denver-area office to Transponder's earth station. Transponder relayed the signal to a satellite owned and operated by another compa-

ny, which transmitted the signal to another earth station. From there, the signal was delivered to the customer's office in another city through local telephone circuits. The same process operated in reverse when the customer's office in that other city wished to communicate with its Denver-area office. *Id.* at 501.

After reviewing expert testimony, Colorado case law and an FCC regulation, we concluded that "an essential attribute of a telephone company is providing a communication service through which customers can communicate with other unrelated persons" and that "telephone companies traditionally provide a communication service which allows customers to contact other customers who may be at many different locations." *Id.* at 503. We then concluded that doubt existed as to whether Transponder was a telephone company because it provided only a private link between the offices of a particular customer. *Id.* at 504. "The kind of intercustomer communication service usually and ordinarily provided by telephone companies is not provided by Transponder." *Id.* Because all doubts concerning taxation are to be resolved against the government and in favor of the taxpayer, we concluded that Transponder could not be considered a telephone company, and, thus, not a public utility, for the purpose of the property taxation statute. *Id.*

In the present case, however, USTS provides exactly the kind of "intercustomer communication service" usually and ordinarily provided by telephone companies. By using the service provided by USTS for the year in question, 23,000 business and residential customers throughout the nation, including those in Colorado, were able to communicate with any person or business with a telephone in the 100 metropoli-

---

**5.** The definition of "public utility" for the purpose of the property taxation statutes has been amended often and is now codified as section 39–4–101(2.5) and (3), 16B C.R.S. (1985 Supp.). *See* ch. 452, sec. 1, § 39–4–101, 1981 Colo.Sess. Laws 1847, 1847; ch. 453, secs. 3 and 4, § 39–4–101, 1981 Colo.Sess.Laws 1849, 1854; ch. 171, sec. 41, § 39–4–101, 1982 Colo.Sess.

Laws 618, 628–29; ch. 429, sec. 3, § 39–4–101, 1983 Colo.Sess. Laws 1494, 1496; ch. 272, sec. 2, § 39–4–101, 1984 Colo.Sess.Laws 988, 989; ch. 276, sec. 2, § 39–4–101, 1984 Colo.Sess.Laws 996, 997. The amendments are not material to the issue before us and do not relate to the tax year in question.

tan areas serviced by USTS. Despite this fact, USTS argues that it is not a telephone company because it does not provide local service, because it does not supply any telephone equipment, and because it must rely on other telephone companies to provide the complete communications link. As part of its argument, USTS notes that in *Transponder*, we found supporting authority for our conception of a telephone company in *General Telephone Co. of Ohio v. Ohio Bell Telephone Co.*, 39 P.U.R.3d 65 (Ohio PUC 1961). *Transponder*, 681 P.2d at 504 n. 8. The 1961 Ohio PUC opinion stated that telephone companies generally offer two basic services, local, or "exchange" service, and toll, or long distance service. 39 P.U.R.3d at 68. That opinion further described a local service area as the area in which exchange subscribers interchange telephone messages at flat monthly rates. *Id.* at 68, 93.

 We are not persuaded by USTS's argument. Whether the services offered by a company exclude local service, as in the case of USTS, or are otherwise geographically limited is of little importance. Rather, if the company directly facilitates two-way communication between a significant number of unrelated persons or businesses, as USTS did, that company is a telephone company. Since the partial breakup of the national telephone monopoly, no company provides complete and consolidated local and long distance telephone service and all essential equipment. If we were to adopt the position of USTS, no company, including Mountain Bell and AT&T, could be considered a telephone company, a result we believe to be manifestly inconsistent with legislative intent.

USTS further argues that the Colorado legislature, when adopting the unitary method for assessing the property of public utilities, intended that valuation method to apply only to regulated monopolies. According to USTS, "[c]entralized unitary assessment of regulated monopolies is preferable to local individual asset assessment because other customary valuation approaches do not work well with regulated monopoly properties," primarily because comparable market sales of individual as-

sets either are nonexistent or do not reflect the real value of those assets to the utility. For support, USTS relies on observations to this effect made in a 1959 report of the Colorado Legislative Council. *See Public Utility Assessments Report*, Colorado Legislative Council Report No. 33 (1959). Because USTS is not a regulated monopoly, the argument proceeds, there is no purpose served by taxing it in the manner designed for taxing public utilities that are regulated monopolies. Thus, USTS urges, it is reasonable to conclude that USTS is not the type of telephone company that is to be considered a public utility for the purpose of property taxation.

However, there is nothing in the statutes to indicate that the legislature intended the unitary property taxation of public utilities to apply only to those companies that are regulated monopolies. The relevant statutes simply state that various types of companies—including telephone companies—are public utilities and that these companies are subject to unitary valuation for assessment for property taxation. Section 39–4–101 does not restrict the definition of "public utility" in this context to regulated monopolies, and the appellant did not produce any legislative history showing that the general assembly intended to limit its definition of "public utility" for property tax purposes to regulated monopolies. The report of the Colorado Legislative Council is not the legislative history of the enactment of the statute in question. Moreover, as USTS itself admits in its brief before this court, there is no conceptual reason that unitary valuation or centralized assessment must be limited to regulated monopolies or limited only to those circumstances in which it would be impossible to apply other valuation or assessment methods.

 Finally, whether a particular company is a public utility for the purpose of rate and service regulation by the Colorado Public Utilities Commission (PUC) is a distinct and separate question from whether that company is a public utility for purposes of property taxation. Separate con-

stitutional and statutory provisions govern the classification of companies as public utilities for each of these two purposes. As an example, the definition of a public utility for the purpose of PUC regulation is entirely different from the definition of a public utility for the purpose of property taxation. *Compare* § 40–1–103, 17 C.R.S. (1984 & 1985 Supp.) (definition of "public utility" for the purpose of PUC regulation) *with* § 39–4–101 (definition of "public utility" for the purpose of property taxation). In short, there is no merit to the argument that only those public utilities that are regulated monopolies were intended by the legislature to be subject to unitary property tax assessment.

USTS also notes that the general assembly considered and rejected a bill in 1979 that would have defined the term "telephone corporation" for the purpose of PUC regulation. *See* H.R. 1520, 52 Gen.Assem., 1st Sess. (1979). USTS likely would have been considered a telephone corporation under the proposed definition. USTS argues that the legislature's defeat of the bill "mandates the conclusion" that the legislature does not intend to include a carrier such as USTS within the meaning of the term "telephone company" for the purpose of property taxation. There is no merit to this argument. First, the proposed amendment related solely to PUC regulation, and whatever meaning the failure of the amendment has in that context is irrelevant to the entirely different subject of the property taxation of public utilities, as discussed above. Second, there are many reasons conceivable for why the general assembly failed to pass the proposed amendment, including, as urged by the appellees, the possibility that the legislature saw no need to adopt the amendment because it considered new and advanced telecommunications companies such as USTS to be included within the usual and ordinary meaning of "telephone corporation." For these reasons, nothing of significance can be gleaned from the failure of the legislature to pass this particular bill.

Finally, USTS argues that courts in other jurisdictions have been reluctant to interpret the term "telephone company" broadly so as to include businesses which, in the words of USTS, "provide a service adjunct to that of the local telephone company." Three of the cited decisions are obviously distinguishable for they held that the transmission of television signals by microwave or by cable does not make a company a "telephone company," primarily because such transmission does not entail two-way communication between users as is required in order to fit within the ordinary meaning of "telephone company." *See Television Transmission, Inc. v. Public Utilities Commission*, 47 Cal.2d 82, 301 P.2d 862, 865 (1956); *Illinois-Indiana Cable Television Assn. v. Illinois Commerce Commission*, 55 Ill.2d 205, 302 N.E.2d 334, 336–41 (1973); *Minnesota Microwave, Inc. v. Public Service Commission*, 291 Minn. 241, 190 N.W.2d 661, 665–67 (1971).

The fourth decision relied upon, *Wilson Communications, Inc. v. Calvert*, 450 S.W.2d 842 (Tex.1970), held that a company providing two-way radio service between automobiles and the lines of the local telephone company was not itself a telephone company for the purpose of a Texas statute levying a tax on the gross receipts of telephone companies. However, the Texas statute expressly imposed the tax only upon charges for the use of lines and telephones and for the lease or use of wires or equipment—services and equipment not provided by Wilson Communications. *Id.* at 844. Because the statute construed in *Wilson Communications* is significantly different from the broad, general statute here, that decision lacks persuasive force in the present context.

We conclude that for the year in question, USTS was doing business as a "telephone company" within the state of Colorado and, for that reason, USTS was a public utility subject to unitary valuation for property tax assessment. We next consider whether USTS had any property within the state subject to taxation.

## III.

USTS argues that the assessment value arrived at by the Board was erroneous

because USTS had no property in this state or, at least, no property with any value during the tax year in question.

By statute, the property tax administrator is directed to determine

the actual value of the *operating property and plant of each public utility* as a unit, giving consideration to the following factors and assigning such weight to each of such factors as in his judgment will secure a just value of such public utility as a unit:

(a) The tangible property comprising its plant, whether the same is situated within this state or both within and without this state, exclusive of any tangible property situated without this state which is not directly connected with the business in which such public utility is engaged within this state;

(b) *Its intangibles, such as special privileges, franchises, contract rights and obligations, and rights-of-way;*

(c) Its gross and net operating revenues during a reasonable period of time not to exceed the most recent five-year period, capitalized at indicative rates;

(d) The average market value of its outstanding securities during the preceding calendar year, if such market value is determinable.

§ 39–4–102(1), 16B C.R.S. (1982) (emphasis added).[6] This statute reflects the view that the true measure of value of the property of a public utility is its worth as an integrated and operating unit rather than the sum of the values of the various components making up that unit. *See Adams Express Co. v. Ohio State Auditor*, 166 U.S. 185, 218–25, 17 S.Ct. 604, 605–08, 41 L.Ed. 965 (1897) (on petition for rehearing);

Bertane, *The Assessment of Public Utility Property in California*, 20 U.C.L.A.L.Rev. 419, 423–24, 425–27 (1973). The operations of USTS reflect the merit of that view, for it is the innovative assemblage of tangibles and intangibles by the use of technological expertise that enables USTS to offer a valuable service.

The statute does not define the relevant term "operating property and plant." However, in valuing the operating property and plant of a public utility, the tax administrator plainly is instructed to consider "the tangible property comprising its plant," of which USTS had none in Colorado for the 1981 tax year, *and* "[i]ts intangibles." Thus, the intangible rights of a public utility that directly contribute to its operations are to be considered as a factor in valuing and taxing the operating property and plant of the public utility.

USTS held intangible rights in Colorado for the tax year in question that formed a crucial part of its operating system—the month-to-month leases of telephone circuits from Mountain Bell, AT&T and MCI. The fact that a typical public utility has tangible property within this state as well as intangible rights does not mean, as USTS implies, that the statutory scheme *requires* that a public utility have tangible property in Colorado before it can be considered to have operating property and plant subject to valuation and taxation. Furthermore, when the administrator scrutinizes the typical public utility that has tangible and intangible property and rights, the statutes do not require or contemplate any exclusion for that portion of the value represented by the intangible rights. Thus, property taxation of a public

---

**6.** In valuing a telephone company, the property tax administrator has the option of valuing the total plant of the company or of valuing only that portion of its property and plant within this state. In either case, the administrator is instructed to value the property in the manner described in section 39–4–102 and discussed in the text. § 39–4–106(3)(a), 16B C.R.S. (1982). If the administrator chooses to value the total property, the administrator must then "[a]llocate to this state, if the actual value of such company is determined as a unit, that propor-tion of such actual value as in his judgment accurately represents the value of the property and plant of such company within this state, utilizing commonly recognized methods of allocation as in his judgment are just and equitable." § 39–4–106(3)(b), 16B C.R.S. (1982). In all cases, the administrator then computes the valuation for assessment, § 39–4–106(3)(c), 16B C.R.S. (1982), and apportions that assessment value among the relevant counties, § 39–4–106(3)(d), 16B C.R.S. (1982).

utility in Colorado is not precluded simply because the only portion of the public utility's operating property and plant found within this state is the intangible rights derived from rental of telephone circuits.

■ USTS argues that because its rights in the circuits at issue have no value if offered in an open market—any common carrier seeking such circuits can obtain them directly from Mountain Bell, AT&T or MCI for the same charge and on the same terms as USTS acquired them pursuant to tariffs on file with the FCC—these rights cannot be considered property. In essence, the argument is that absent an independent market value for the rights, there is nothing of value in Colorado upon which a property tax can be predicated. There are several flaws in this argument. First, whether the rights at issue had any value, however measured, is conceptually unrelated to the question of whether they represent a part of the operating property and plant of USTS. Moreover, there are various methods for determining the value of property to the owner, and the rights at issue here can be valued in like fashion. What the property would fetch in an open market, if that can be determined, is only one of the methods of determining value. Other measures of value include what the property cost the owner, what it would cost to replace that property, and the capitalized value of the income that can be derived from that property. In fact, it is precisely because the real value of the operating property and plant of a public utility may be either more or less than the sum of the values of the tangible assets and intangible rights considered individually, some of which do not exist or are of questionable value apart from the utility as a whole, that the unitary valuation concept is used for assessment purposes. Bertane, *The Assessment of Public Utility Property in California*, 20 U.C.L.A. L.Rev. at 426–27; *see also Adams Express Co. v. Ohio State Auditor*, 166 U.S. at 218–25, 17 S.Ct. at 605–08. Whether the rights at issue could command a particular price, or any price, if offered separately in an open market is not dispositive.

USTS further contends that the state did not value USTS's intangible rights in the circuits, but rather valued the stream of income derived by the company from the services it provided customers in Colorado. During oral argument, the assistant attorney general arguing on behalf of the state expressed the opinion that if a public utility derived a stream of income from its operations in this state, that company would be susceptible to an apportioned property tax based on the unitary valuation method *even if* the company had no property—tangible or intangible—in this state. Whatever the merits of that position might be, the hypothetical issue posed is not present in this case, for intangible rights that are part of USTS's operating property and plant existed in this state during the tax year in question and underlie the apportioned unitary value.

Relying on *City & County of Denver v. Security Life & Accident Co.*, 173 Colo. 248, 477 P.2d 369 (1970), USTS next argues that the statutes must specifically authorize the taxation of property leased by a taxpayer from another and that the statutes do not authorize such taxation here. In *Security Life*, we held that a lessee of office furniture and equipment was not liable for an ad valorem tax levied against such personal property. We reached this conclusion by noting that the statutes authorizing the taxation of personal property consistently referred to the taxation of the "owner" of that property, that a lessee is not an "owner" as that term is commonly understood, and that "if a lessee's interest in personal property is to be taxed, there must be a statute specifically so stating." 173 Colo. at 250, 477 P.2d at 371. Here, in contrast, the statutes authorizing the unitary valuation of the property of a public utility for the purpose of property taxation expressly direct the administrator to consider the intangible rights of the public utility as one factor in the valuation of the utility's total operating property and plant. § 39–4–102(1)(b), 16B C.R.S. (1982). Thus, any objection based on our holding in *Security Life* is without merit.

■ Additionally, USTS argues that impermissible double taxation will occur if the state is permitted to levy a property tax against USTS based on the circuits at issue while at the same time taxing the owners of those circuits, i.e., Mountain Bell, AT&T and MCI, as part of those companies' operating property and plant. We disagree. It is conceptually possible to tax the particular interest of a taxpayer in certain property, such as a leasehold interest, and to segregate and tax the distinct interests of another in that same property, such as the lessor's reversionary interest. Both taxpayers hold property of value. *See, e.g., City & County of Denver v. Boettcher*, 99 Colo. 408, 413–15, 63 P.2d 447, 449–50 (1936). *See also* § 39–1–106, 16B C.R.S. (1982). Here, it is the value of the property and rights of a public utility as an integrated unit that is the concern in unitary valuation and apportionment. USTS's rights in the circuits in question have a value as a part of USTS's operating property and plant separate and apart from the value of the lessor's reversionary interests in those circuits.

Finally, USTS argues that its intangible rights are exempt from property taxation pursuant to section 39–3–101(1)(i), 16B C.R.S. (1982). Section 39–3–101(1) describes a variety of types of property that are exempt from general property taxation under the provisions of articles 1 to 13 of title 39, 16B C.R.S. (1982 & 1985 Supp.). Subsection (i) exempts "[i]ntangible personal property" from property taxation.

■ Despite the general exemption for intangible personal property, the legislature also declared that a public utility's "intangibles" must be considered when valuing its operating property and plant as a unit. § 39–4–102(1), 16B C.R.S. (1982). We see no necessary conflict between the exemption of intangible personal property, as such, from taxation and the mandate to consider intangibles when valuing public utility property on a unitary basis. To the extent that the two statutory provisions

may be read to conflict, the special provision for public utility taxation must prevail over the general exemption for intangible personal property. *See* § 2–4–205, 1B C.R.S. (1980). Because we hold that the exemption does not apply here, we need not decide whether the rights held by USTS are in fact "intangible personal property" as that term is used in section 39–3–101(1)(i).

In sum, we hold that USTS did have property within the state of Colorado subject to valuation and assessment for property tax purposes for the 1981 tax year. We turn next to the question of whether the determination of the value of that property and the levy of a tax on the resulting valuation for assessment violates the commerce clause in article I, section 8, of the United States Constitution.

## IV.

■ Article I, section 8, clause 3, of the United States Constitution vests in Congress the power to regulate commerce among the several states.[7] The commerce clause has been recognized as a limitation on state power, prohibiting states from interfering with interstate commerce. *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980); *Archer Daniels Midland Co. v. State of Colorado*, 690 P.2d 177, 182 (Colo. 1984). The commerce clause, however, does not eclipse the reserved power of the states to tax companies doing interstate business. *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 328–29, 97 S.Ct. 599, 605–06, 50 L.Ed.2d 514 (1977). "It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business." *General Motors Corp. v. Washington*, 377 U.S. 436, 439, 84 S.Ct. 1564, 1567, 12 L.Ed.2d 430 (1964), *quoting Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 58

---

7. Article I, section 8, clause 3, of the United States Constitution, commonly known as the commerce clause, provides:

The congress shall have power:

. . . .

(3) To regulate commerce with foreign nations, and among the several states, and with the Indian tribes.

S.Ct. 546, 548, 82 L.Ed. 823 (1938). A tax levied by a state will be sustained against a commerce clause challenge when the tax is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state. *Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 443, 100 S.Ct. 1223, 1234, 63 L.Ed.2d 510 (1980); *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977).

A state may levy a tax on the property of a corporation engaged in interstate commerce when that property is within the taxing state. *Western Live Stock v. Bureau of Revenue*, 303 U.S. at 254–55, 58 S.Ct. at 548; *Postal Telegraph Cable Co. v. Adams*, 155 U.S. 688, 696–97, 15 S.Ct. 268, 269–70, 39 L.Ed. 311 (1895); *Pullman's Palace Car Co. v. Pennsylvania*, 141 U.S. 18, 22–23, 11 S.Ct. 876, 877–78, 35 L.Ed. 613 (1891); *Gloucester Ferry Co. v. Pennsylvania*, 114 U.S. 196, 206, 5 S.Ct. 826, 829, 29 L.Ed. 158 (1885). If the property valued is used both within and without the state, the tax must be fairly apportioned to its use within the state in order for the tax to be sustained against a commerce clause challenge. *Western Live Stock v. Bureau of Revenue*, 303 U.S. at 255, 58 S.Ct. at 548; *Pullman's Palace Car Co. v. Pennsylvania*, 141 U.S. at 26, 11 S.Ct. at 879. *See also Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 305–06, 64 S.Ct. 950, 956–57, 88 L.Ed. 1283 (1944) (Jackson, J., concurring), and at 309, 64 S.Ct. at 958 (Stone, C.J., dissenting).

In its challenge here, USTS primarily reiterates its argument that it has no property within the state of Colorado. Therefore, any attempt by the state to levy a property tax based on an apportionment of the value of USTS's property as a whole is constitutionally impermissible because there is no nexus between the state and USTS's property. We have already decided, however, that USTS had intangible property in this state during the year in question. Consistent with the demands of the commerce clause, intangible property

may be taxed by a state in which the property has a determinable situs. *See Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. at 444, 100 S.Ct. at 1235; *Railway Express Agency, Inc. v. Virginia*, 358 U.S. 434, 440–43, 79 S.Ct. 411, 415–17, 3 L.Ed.2d 450 (1959); *Wheeling Steel Corp. v. Fox*, 298 U.S. 193, 208–11, 56 S.Ct. 773, 776–77, 80 L.Ed. 1143 (1936); *Louisville & Jeffersonville Ferry Co. v. Kentucky*, 188 U.S. 385, 395–98, 23 S.Ct. 463, 466–67, 47 L.Ed. 513 (1903); *Adams Express Co. v. Ohio State Auditor*, 166 U.S. 185, 218–25, 17 S.Ct. 604, 605–08, 41 L.Ed. 965 (1897) (on petition for rehearing); *Pullman's Palace Car Co. v. Pennsylvania*, 141 U.S. at 22, 11 S.Ct. at 877. As stated by the United States Supreme Court as far back as 1897:

> In the complex civilization of to-day a large portion of the wealth of a community consists in intangible property, and there is nothing in the nature of things or in the limitations of the Federal Constitution which restrains a State from taxing at its real value such intangible property.

*Adams Express Co. v. Ohio State Auditor*, 166 U.S. at 218–19, 17 S.Ct. at 605. Similarly, we discern no reason why the intangible property of a public utility within a state does not provide a sufficient nexus between the utility and the state to support a tax upon that part of the value of the operating property and plant of the utility, valued as a unit, that can be fairly allocated to the state. The intangible rights providing the basis for a tax upon an allocated portion of USTS's operating property and plant—the circuits leased by USTS from Mountain Bell, AT&T and MCI that are used by USTS to transmit calls in and out of this state—are situated within the state of Colorado. We believe that the imposition of a property tax here is fully consistent with the commerce clause.

In addition, USTS argues that the method of apportionment utilized by the Board violated the commerce clause. The district court concluded that the methodology used by the Board in arriving at the apportioned value for assessment was consistent with

the law and was not arbitrary and capricious. We agree.

As noted above, if a state utilizes a unitary method for property taxation, that state must apportion fairly the value of the total property to represent the value attributable to the state. Here, the Board first determined the total value of USTS's operating property and plant.[8] To arrive at the value of the portion of the property attributable to USTS's operations in Colorado, the Board then multiplied that total by an allocation fraction derived by comparing USTS's gross revenues in Colorado to the company's gross revenues as a whole. USTS argues that the Board was constitutionally required to utilize a three-factor apportionment formula based on the average of the ratios of gross revenue, payroll, and property value within Colorado to gross revenue, payroll and property value of the company as a whole. This three-factor apportionment formula is traditionally utilized by states to determine the portion of the total income of an interstate business attributable to a state for the purpose of income taxation, *see Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 283–85, 283 n. 1, 284 n. 2, 98 S.Ct. 2340, 2349–51, 2349 n. 1, 2350 n. 2, 57 L.Ed.2d 197 (1978) (Powell, J., dissenting), although Colorado presently uses a two-factor formula to apportion income for taxation, § 39–22–303, 16B C.R.S. (1982 & 1985 Supp.). In the present case the Board employed a single factor formula based on gross revenues. The legislature has not mandated the use of any particular allocation formula for apportioning the unitary value of a telephone company's property to Colorado for the purpose of property taxation. Rather, the property

---

**8.** The property tax administrator determined the actual value of USTS's operating property and plant to be $666,700 and its valuation for assessment to be $200,000. The Board found that the evidence presented to it was not sufficiently probative to substantiate the methodologies and procedures used in reaching this assessment valuation, a conclusion supported by the evidence. "For that reason, this Board found itself in the position of attempting to arrive at a reasonable assessed valuation for the subject property which would be equitable to both parties." To derive a total system value for USTS's property, the Board used financial figures supplied by USTS in its Annual Statement of Property, required of all public utilities. *See* § 39–4–103, 16B C.R.S. (1982). This resulted in a total system value based upon cost, reduced by depreciation. Normally, the total system value based on "cost," or more exactly, net book value, would have been averaged, by the use of a weighted average formula, with the value of the operating property and plant as determined by capitalizing the income derived from that property and with the market value of the stock and debt of the company. However, because the stock of USTS had no determinable market value since USTS was a wholly-owned subsidiary of ITT, neither the property tax administrator nor the Board utilized that factor. Also, because USTS showed an operating loss for the year in question, the value of the property as measured by capitalizing income was zero (or less).

When the average of the cost value and an income capitalization value produces a value of less than 75% of the cost value, the division discards the averaging mechanism and instead relies solely on the cost value but reduces that value by 25% to arrive at total plant value. No explanation was given for why this particular reduction factor was used, and USTS did not ask for any. The Board used this reduction factor when calculating USTS's property tax for the year in question. USTS suggests now that this valuation methodology is arbitrary and cannot withstand constitutional scrutiny.

First, we note that in closing arguments to the Board, USTS directly proposed that the Board use this method for valuing USTS's total system, differing with the formula eventually used by the Board only in the apportionment factor utilized to determine Colorado's share of the total system value. Therefore, USTS should not be allowed to challenge this methodology on appeal. Furthermore, the evidence suggests no reason that the Board would not have been justified in valuing the property solely by the cost method without using *any* reduction factor, let alone 25%. Thus, although the reduction factor as presented seems arbitrary, it does not appear to have worked to USTS's prejudice. Finally, we note that in calculating the total cost of USTS's operating property and plant, the Board, either inadvertently or intentionally, omitted the $18 million dollars worth of property and plant *leased* by USTS throughout the nation. Because the Board was, in theory, considering the property leased by USTS in this state as a part of USTS's operating property and plant for the purpose of allocating its unitary value, as we conclude it was authorized to do by statute, logically the Board could have included the value of all leased property in arriving at the total system value, calculated by the cost method or otherwise. It did not, and USTS again benefited.

tax administrator is required to allocate to this state "that proportion of such actual value as in his judgment accurately represents the value of the property and plant of such company within this state, utilizing commonly recognized methods of allocation as in his judgment are just and equitable." § 39–4–106(3)(b), 16B C.R.S. (1982).

The United States Supreme Court has never held, in the context of a commerce clause challenge to unitary income taxation, that a single-factor apportionment formula is constitutionally impermissible. Rather, the Court has "repeatedly held that a single-factor formula is presumptively valid." *Moorman Mfg. Co. v. Bair,* 437 U.S. at 273, 98 S.Ct. at 2344. In the property tax context, the Court approved a single-factor apportionment formula when Pennsylvania levied a tax on the capital stock of a railroad corporation, considered personal property by the state, based on the number of miles of railroad track within the state over which cars were run by the company compared to the number of total miles over which its cars were run. *Pullman's Palace Car Co. v. Pennsylvania,* 141 U.S. at 26, 11 S.Ct. at 879. The Court subsequently approved a tax levied on the intangible property of a railroad company by the state of Virginia apportioned solely on the basis of the ratio of the gross receipts of the company within the state to its total gross receipts. *Railway Express Agency, Inc. v. Virginia,* 358 U.S. at 438–39, 441–42, 79 S.Ct. at 416. There are various formulas utilized by the states, and sanctioned by the courts, for allocating a portion of the system value of a public utility to a state for the purpose of property taxation, including "mileage, income or revenue produced, use of property, historical or reproduction cost of physical property, or a combination of these factors." Bertane, *The Assessment of Public Utility Property in California,* 20 U.C.L.A.L.Rev. at 445. *See also* Bertane at 443–44, 445–46, 445 n. 98, 446 n. 99 (and cases cited therein). Thus, there is nothing intrinsically unconstitutional about the Board's utilization of a single-factor apportionment formula based on the ratio of gross revenue derived in this state to reve-

nue derived from the operating property and plant as a whole. *See Railway Express Agency, Inc. v. Virginia,* 358 U.S. at 441, 79 S.Ct. at 416 ("Appellant buttresses its argument with reasoning that a tax on 'going concern' value just cannot be measured by fairly apportioned gross receipts. While it may be true that gross receipts are not the best measure, it is too late now to question its constitutionality.").

USTS did not demonstrate that the application of that single-factor apportionment formula worked any significant prejudice to the company in this case. In its closing argument to the Board, USTS proposed that, "if [the Board] insist[s] that we have some property here," the allocation fraction derived by the comparison of USTS's gross revenues within the state to total gross revenues (.00134) be halved (.00067) by the use of a two-factor apportionment formula that included the gross receipts ratio *and* a ratio involving property values within the state to property values as a whole. This is a formula similar to that utilized by the state to derive the income tax to be paid by corporations doing business in Colorado and elsewhere. *See* § 39–22–303, 16B C.R.S. (1982 & 1985 Supp.). However, this argument reflected USTS's view that it had no property of any value in this state; hence, the ratio of property in this state to property as a whole would be zero and, averaged with the gross revenue ratio, would reduce that latter ratio by half. The Board did not err in rejecting this proposal, given that USTS had operating property within this state.

■ USTS never offered a recalculated two-factor apportionment fraction incorporating a ratio of USTS's cost of its rights in this state compared to the cost of USTS's operating property and plant as a whole. Nor did USTS otherwise demonstrate that a multi-factor apportionment formula was necessary in this case to prevent arbitrary and unfair taxation or taxation that impermissibly interfered with interstate commerce. In the absence of such a demonstration, we believe that the allocation complied with the statutory charge to the prop-

erty tax administrator to "[a]llocate to this state, if the actual value of [a telephone company] is determined as a unit, that proportion of such actual value as in his judgment accurately represents the value of the property and plant of such company within this state, utilizing commonly recognized methods of allocation as in his judgment are just and equitable." § 39–4–106(3)(b), 16B C.R.S. (1982).[9]

The judgment of the district court is affirmed.

9. It can be persuasively argued that a two-or-more factor apportionment formula produces fairer results and should be utilized if the information necessary to calculate the various ratios is available. However, we decline to hold that the use of a single-factor apportionment formula when a multi-factor formula could have been employed is necessarily improper. It would be especially inappropriate to overturn the Board's single-factor apportionment formula where, as here, the party complaining does not factually demonstrate that it has suffered actual prejudice.