842 So.2d 617 (2002)
FAST PHONES, INC.
v.
CITY OF MONTGOMERY.
1002017.
Supreme Court of Alabama.
May 17, 2002.
Rehearing Denied August 30, 2002.
*618 Thomas R. DeBray and Carla Cole Gilmore of Kaufman & Rothfeder, P.C., Montgomery, for appellant.
Robert Black, Jr., and Doy Leale McCall III of Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery, for appellee.
PER CURIAM.
The City of Montgomery ("the City") assessed Fast Phones, Inc., a license fee in the amount of $12,000, pursuant to City of Montgomery License Ordinance No. 48-91, § 19C-21i, which authorizes the City to collect a license fee from any "person, firm, or corporation which operates a telephone exchange or exchanges within the City." Fast Phones paid the license fee under protest and appealed the assessment to the City's Board of Revenue Appeals ("the Board"). The Board upheld the assessment. Fast Phones appealed to the Montgomery Circuit Court, seeking a de novo review of the Board's decision. The trial court entered a summary judgment in favor of the City, and Fast Phones appealed. We reverse and render a judgment for Fast Phones.
The issue presented is whether Fast Phones is subject to City of Montgomery License Ordinance No. 48-91, § 19C-21i ("the telephone-exchange ordinance"). Fast Phones asserts that it is merely a reseller of telephone services and that it does not operate a "telephone exchange." Fast Phones contends that it is not, therefore, properly subject to the telephone-exchange ordinance and does not owe the $12,000 license fee. Alternatively, Fast Phones contends that the telephone-exchange ordinance violates the terms and conditions of the Federal Telecommunications Act of 1996, 47 U.S.C. § 151 et seq. ("the FTA"). Because we agree that Fast Phones is not operating a "telephone exchange," we do not reach its contentions relative to the FTA.

Standard of Review
We review a summary judgment de novo.
"In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).

*619 Authorization for the License Fee

Pursuant to the telephone-exchange ordinance, the City imposes a $12,000 license fee on entities that operate a "telephone exchange or exchanges within the City of Montgomery." The ordinance does not define "telephone exchange."
The authority for the telephone-exchange ordinance is derived from § 11-51-90, Ala.Code 1975, which provides:
"(a) All municipalities shall have the following powers:
"(1) To license any exhibition, trade, business, vocation, occupation, or profession not prohibited by the Constitution or laws of the state which may be engaged in or carried on in the city or town.
"(2) To fix the amount of licenses....
". . . .
". . . .
"(c) The power to license conferred by this division may be used in the exercise of the police power as well as for the purpose of raising revenue, or both."
Additionally, § 11-51-128, Ala.Code 1975, establishes the maximum amount of license tax a municipality may assess annually upon any entity operating a telephone exchange within that municipality. Under this statute, a municipality with a population the size of the City may assess no more than $12,000 for a telephone-exchange license. Section 11-51-128 does not define "telephone exchange."

Whether Fast Phones Operates A Telephone Exchange
Fast Phones alleges that it does not operate a "telephone exchange" because, it argues, it merely "resells" telephone services. Fast Phones argues that because it resells telephone services, does not own any telephone lines or equipment, and does not control the "central office" where the telephone services are actually connected and disconnected, it should not be considered an operator of a "telephone exchange" and, thus, it should not be subject to the license fee imposed by the City.
The record reveals that Fast Phones has an agreement with BellSouth Telecommunications, Inc. ("BellSouth"), pursuant to which Fast Phones leases local telephone lines from BellSouth. Fast Phones then sells local telephone service to consumers whose credit history is poor; it sells that service at a price higher than the price BellSouth ordinarily charges its customers. At the time of the hearing on the City's summary-judgment motion, Fast Phones was leasing approximately 1,000 lines from BellSouth.
BellSouth owns all of the facilities and equipment necessary to provide the local telephone service Fast Phones resells. Fast Phones itself does not own any facilities, transmission equipment, telephone lines, switching equipment, or other engineering equipment. Furthermore, Fast Phones does not perform maintenance work on the telephone lines or the equipment, and it does not provide long-distance telephone service.
According to Fast Phones, it merely takes orders for service from its limited market and then instructs BellSouth to connect or disconnect a particular customer's telephone service. In other words, Fast Phones purchases services from BellSouth and then offers those services to its own customers at a price it sets. Once a customer contracts with Fast Phones, Fast Phones pays BellSouth an amount to cover the cost of the customer's first month of telephone service at BellSouth's rate and to cover any required deposit so that BellSouth will connect telephone services for that customer.
*620 A customer who contracts with Fast Phones does not pay BellSouth directly for telephone services; the customer makes its payments to Fast Phones. In turn, BellSouth bills Fast Phones for all of the telephone services Fast Phones' customers receive. Fast Phones is responsible for paying BellSouth and for collecting any unpaid amounts from its own customers. If Fast Phones' customers do not pay their telephone bills, Fast Phones, not BellSouth, loses money. Thus, Fast Phones is not obtaining customers for BellSouth, but is instead recruiting its own high-risk customers for a profit.
Fast Phones' customers do not contact BellSouth to report telephone problems. Fast Phones maintains a toll-free telephone number its customers can call to report problems with their telephone service. Fast Phones then reports those problems to BellSouth and requests that BellSouth investigate and correct the problems. Thus, Fast Phones' customers have no direct contact with BellSouth.
In order to conduct its business, Fast Phones is required to obtain a certificate of public convenience and necessity from the Alabama Public Service Commission ("the APSC"). In its application, Fast Phones requested a certificate of public convenience and necessity to provide "resold local exchange service" in the State of Alabama. The APSC issued the certificate to Fast Phones. Thus, Fast Phones and the APSC characterize Fast Phones' business as the reselling of local telephone-exchange service.
Fast Phones argues that because neither the telephone-exchange ordinance nor § 11-51-128 defines "telephone exchange," the "Telephone Rules" of the APSC are the most logical authority to consult to determine the meaning of that term. Rule T-2(U), Telephone Rules of the APSC, defines an "exchange" as "[t]he entire telephone plant and facilities used in furnishing local telephone service to customers located in an exchange service area. An exchange may include more than one central office unit." Rule T-2(I) defines a "central office" as "[a] switching unit, in a telecommunications system which provides service to the general public, having the necessary equipment and operating arrangements for terminating and interconnecting customer lines and trunks or trunks only." Fast Phones does not operate any switching units and does not have even the first "central office unit," much less "more than one central office unit."
The Alabama Court of Civil Appeals has addressed and rejected the exact argument Fast Phones raises in this Court. In Dial Tone, Inc. v. City of Montgomery, 774 So.2d 592 (Ala.Civ.App.1999),[1] Dial Tone, Inc., also a reseller of local telephone services, challenged the same license fee at issue in this case. Dial Tone argued that because it merely resold telephone service and did not own or operate any equipment that enabled the telephone service to function, it could not be considered to be operating a "telephone exchange." Thus, Dial Tone argued, it could not be subject to the license fee imposed pursuant to the telephone-exchange ordinance.
The Court of Civil Appeals stated:
"We reject the argument that, to operate a telephone exchange, one must own or handle the equipment that allows a telephone system to function....
"We hold that a service provider such as Dial Tone is the operator of a telephone exchange, because it furnishes the benefits of telephone communication to its customers by `directly facilitat[ing] *621 two-way communication between a significant number of unrelated persons or businesses.' See Alabama State Dep't of Revenue v. Telamarketing Communications, 514 So.2d 1388, 1390 (Ala.Civ.App. 1987) (quoting United States Transmission Systems, Inc. v. Board of Assessment Appeals, 715 P.2d 1249, 1254 (Colo.1986)). In Telamarketing Communications of Montgomery, supra, this court held that companies that resell long-distance telephone services are engaged in the `telephone business' for purposes of the telephone gross-receipts license tax of § 40-21-58, Ala.Code 1975....
". . . .
"Our decision in Telamarketing Communications recognized the business and economic reality that `resellers' of telephone service perform the same functions as the `traditional' telephone companies. Because of that reality, they are subject to many of the same requirements as the traditional companies, among those requirements being the obligation to pay tax and business-license assessments."
774 So.2d at 594. Being in the "telephone business" and operating a "telephone exchange" are distinctly different. Alabama State Department of Revenue v. Telamarketing Communications of Montgomery, 514 So.2d 1388 (Ala.Civ.App.1987), relied upon by the Court of Civil Appeals in Dial Tone, recognizes "business and economic reality" when it treats resellers of telephone services as engaging in the "telephone business." Nevertheless, it ignores reality to treat Fast Phones as an operator of a telephone exchange. Fast Phones merely "resells" telephone services. Simply because the APSC authorized Fast Phones to provide "resold local exchange service" does not make Fast Phones a telephone exchange. (Emphasis added.) To accept the concept that a reseller of telephone services is a telephone exchange is an impermissible stretch of logic.
"Telephone exchange" is a term that has been with us since the invention of the telephone. In Davidson v. Alabama Power Co., 203 Ala. 77, 82 So. 91 (1919), an action against Alabama Power Company alleging that a telephone exchange had been destroyed as a result of a power surge through a telephone line, this Court described such an operation:
"[T]he plaintiffs owned a building at Helena, Ala., in which was operated a telephone exchange owned by the plaintiffs, and there was in said building a large number of telephones, office furniture, and fixtures stored, and in connection with said telephone business plaintiffs had in said building a telephone switchboard and all appliances and apparatus necessary to operate the same, together with telephone wires, telephone attachments and equipments, and $86.60 in cash in said building."
203 Ala. at 77, 82 So. at 91 (quoting the plaintiffs' complaint). Viewed in the proper historical perspective, Fast Phones' operation does not remotely resemble the operation of a telephone exchange.
This Court is not at liberty to update the definition of a telephone exchange to embrace resellers of services originating in a telephone exchange under the guise of recognizing "business and economic reality." Any amendments to the telephone-exchange ordinance should fall exclusively within the province of the City. To hold otherwise would convert a reseller of automobiles purchased from the manufacturer into a manufacturer of automobiles. A newspaper carrier would become a publisher. Every local hotel and motel providing a telephone in a guest's room and charging a fee per local call and providing *622 an employee to handle any complaints about the telephone service would become a "telephone exchange" subject to the flat $12,000 per year license fee charged by the City. Such activity by a local hotel or motel is indistinguishable from the activity the Court of Civil Appeals erroneously described in Dial Tone as "furnish[ing] the benefits of telephone communication to its customers by `directly facilitat[ing] two-way communication between a significant number of unrelated persons or businesses.'" 774 So.2d at 594 (quoting Telamarketing Communications, 514 So.2d at 1390, quoting in turn United States Transmission Systems, Inc. v. Board of Assessment Appeals, 715 P.2d 1249, 1254 (Colo. 1986)). We expressly overrule Dial Tone, to the extent it conflicts with our holding in this case.

Conclusion
Whether an ordinance imposing a license fee on Fast Phones can be drafted or framed based on an accurate description of Fast Phones' business activities is a question not before us. However, on the present record, we conclude that the trial court improperly entered the summary judgment in favor of the City. We therefore reverse that judgment and render a judgment for Fast Phones.
REVERSED AND JUDGMENT RENDERED.
MOORE, C.J., and HOUSTON, SEE, LYONS, BROWN, and JOHNSTONE, JJ., concur.
HARWOOD, WOODALL, and STUART, JJ., dissent.
STUART, Justice (dissenting).
Because I would conclude that Fast Phones is subject to Ordinance No. 48-91, I would address the question whether that ordinance violates the Federal Telecommunications Act. I conclude that it does not; therefore, I dissent from the majority opinion.

Is Fast Phones Subject to Montgomery Ordinance No. 48-91?
The dispositive issue before this Court is whether Fast Phones operates a "telephone exchange." If so, Fast Phones is subject to Montgomery Ordinance No. 48-91, which imposes a $12,000 license fee upon every entity operating a telephone exchange within the City. The analysis is complicated by the fact that the authorizing ordinance and the applicable statute do not define "telephone exchange." However, the Alabama Public Service Commission ("the PSC"), the agency charged with regulating the telecommunications industry in this State, has defined "exchange" as "the entire telephone plant and facilities used in furnishing local telephone service to customers located in an exchange service area. An exchange may include more than one central office unit." Although I agree that we should defer to the PSC as to the meaning of this term, I am not persuaded that the majority opinion has construed or applied the PSC's definition properly.
I do not interpret this definition, which merely provides that an exchange "may include more than one central office unit," to require a "central office unit" in order to constitute an exchange. I interpret the PSC's definition of an "exchange" simply to refer to all of the facilities of any one entity providing telephone service in a particular exchange area, including as many switching units, if any, as may be included within that particular exchange area. As applied to Fast Phones, this would encompass all of its locations within its Montgomery exchange area.
Relying on historical perspective, the majority opinion apparently interprets an operator of a "telephone exchange" to *623 mean only one thinga provider of telecommunication services that operates a "telephone switchboard" at which an actual person sits, plugging and unplugging different lines so that two or more people may communicate by telephone. Although this may be the historical meaning associated with a telephone exchange, I doubt any modern-day telecommunication providers operate in such a manner.
However, assuming that the majority is correct and that this Court must interpret the term "telephone exchange" through a historical lens, we must consider the impact of that interpretation. If the majority's logic is to stand, municipalities within this State may impose licensing fees only upon those telecommunication providers that continue to provide telephone services through an antiquated switchboard system at which an operator sits personally connecting each and every call. I do not believe this Court is constrained to such a historical perspective, and I cannot concur in such a limited definition of "telephone exchange" without a more specific definition from the PSC or the Legislature.
The majority approach also limits the entities to which the license fee may be applied to only those telecommunication providers who own the equipment and the telephone lines. Under such an approach, only one or two telecommunication providers in each municipalitytypically BellSouthwill be subject to the license fee, because of the application of the principle known as "economies of scale." In each municipality, there is generally only one entity that has gone (or should go) to the expense of purchasing and setting up the telephone lines and equipment ("the switchboard") required to service the market. According to the majority opinion, this entityand only this entityis an operator of a "telephone exchange." In this case, BellSouth, which once had a monopoly in the Montgomery market, has incurred those expenses and, under the majority opinion, operates a telephone exchange in Montgomery.
However, BellSouth, as the former monopolist, was required, pursuant to the Federal Telecommunications Act ("the FTA") to allow its competitors access to its lines and equipment. If BellSouth is the only telecommunications provider in Montgomery subject to the $12,000 license fee, simply by virtue of its owning the telephone lines and equipment, the newly emerged resellers of BellSouth's services will have a distinct advantage over the very carrier required by the FTA to accommodate its competition. I do not believe this was the intent of § 11-51-128, Ala.Code 1975, or of the FTA.
Under the scenario before us, Fast Phones is analogous to a retailer of telephone-exchange services in the Montgomery market. Fast Phones has obtained from BellSouth, which serves as a wholesaler, items with which to stock its "shelves." The simple fact that BellSouth is also a retailer in that same market does not change the fact that Fast Phones is marketing telephone-exchange services. Because both BellSouth and Fast Phones are retailers of telephone-exchange services, they are both subject to the same licensing fee.
Nor does the fact that Fast Phones does not itself own the telephone lines prevent the conclusion that Fast Phones is an operator of a telephone exchange.[2] Fast Phones' customers are not purchasing services from BellSouth. They are purchasing *624 telephone services directly from Fast Phones, which operates a "local exchange service," and Fast Phones profits from its sale of that service.[3]
Further, Fast Phones' argument that it cannot make a suitable profit if it is required to pay the $12,000 licensing fee is not relevant to an analysis of whether Fast Phones operates a telephone exchange. I find nothing in the FTA, the Alabama Code, or the PSC definitions, or in any caselaw, to justify providing resellers of telecommunications services with a guarantee of success or a guarantee of a certain profit margin.
Moreover, I agree with the Court of Civil Appeals' decision in Dial Tone, Inc. v. City of Montgomery, 774 So.2d 592 (Ala. Civ.App.1999), a case in which this Court denied certiorari review. In Dial Tone, the Court of Civil Appeals stated:
"We reject the argument that, to operate a telephone exchange, one must own or handle the equipment that allows a telephone system to function....
"We hold that a service provider such as Dial Tone is the operator of a telephone exchange, because it furnishes the benefits of telephone communication to its customers by `directly facilitat[ing] two-way communication between a significant number of unrelated persons or businesses.' See Alabama State Dep't of Revenue v. Telamarketing Communications, 514 So.2d 1388, 1390 (Ala.Civ. App.1987) (quoting United States Transmission Systems, Inc. v. Board of Assessment Appeals, 715 P.2d 1249, 1254 (Colo.1986)). In Telamarketing Communications, supra, this court held that companies that resell long-distance telephone services are engaged in the `telephone business' for purposes of the telephone gross-receipts license tax of § 40-21-58, Ala.Code 1975....
". . . .
"Our decision in Telamarketing Communications recognized the business and economic reality that `resellers' of telephone service perform the same functions as the `traditional' telephone companies. Because of that reality, they are subject to many of the same requirements as the traditional companies, among those requirements being the obligation to pay tax and business-license assessments."
Dial Tone, 774 So.2d at 594. Fast Phones furnishes the benefits of telephone communication to its customers by "directly facilitat[ing] two-way communication between a *625 significant number of unrelated persons or businesses." Dial Tone, 774 So.2d at 594.
Fast Phones argues that Dial Tone was wrongly decided in light of the FTA, which was passed in 1996 and which, Fast Phones alleges, made sweeping changes to the telecommunications industry. As evidence that the Dial Tone decision is wrong, Fast Phones asserts that, in that opinion, the Court of Civil Appeals did not reference or acknowledge the passage or applicability of the FTA.
However, in Dial Tone, the court cited a portion of 47 U.S.C. § 153(r), which defines the term "telephone-exchange service" as follows:
"`[s]ervice within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge.'"
774 So.2d at 593. This statute is one of those the FTA was intended to amend. Importantly, the FTA did not modify in any way the definition of "telephone-exchange service" found in 47 U.S.C. § 153(r). Thus, the Dial Tone court did refer to and did acknowledge the statutes to which the FTA is applicable.
For these reasons, I conclude that Fast Phones is operating a "telephone exchange," as that term was defined by the Court of Civil Appeals in Dial Tone; I also conclude that Fast Phones fits within the PSC's definition of an "exchange." Accordingly, I conclude that Fast Phones is subject to Montgomery Ordinance No. 48-91, which is applicable to each person, firm, or corporation operating a "telephone exchange" within the City.

Does Ordinance No. 48-91 Violate the Federal Telecommunications Act of 1996?
Because I conclude that Fast Phones is subject to Montgomery Ordinance No. 48-91, it is necessary to address Fast Phones' alternative argumentthat, even if Fast Phones is deemed to operate a "telephone exchange," Ordinance No. 48-91 is invalid or inapplicable as to Fast Phones by virtue of the FTA. The FTA was enacted to foster competition in the local telephone-service market by ending the monopolies held by local telephone-service providers.
Fast Phones argues that the City's business-license tax is invalid or inapplicable to it under 47 U.S.C. § 253, a portion of the FTA. This statute is entitled "Removal of barriers to entry," and provides as follows:
"(a) In general
"No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.
"(b) State regulatory authority
"Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.
"(c) State and local government authority
"Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory *626 basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."
Fast Phones interprets this statute to mean that "§ 253(a) preempts all state and local regulations that `prohibit or have the effect of prohibiting' any company's ability to provide telecommunications services, unless such regulations fall within either of the safe harbors found in §§ 253(b) or (c)." Fast Phones argues that Ordinance No. 48-91 does not fall under any of these enumerated safe harbors and, thus, that the ordinance violates § 253(a) by creating a barrier to smaller businesses attempting to enter the telecommunications market in Montgomery.
The City of Montgomery responds that under Ala.Code 1975, § 11-51-90, the State has conferred statutory authority upon it to tax entities doing business within the City under the exercise of its police power or to raise revenue or both. Additionally, the City argues that under Ala. Code 1975, § 11-51-128(a)(123), the State has specifically authorized the City to impose the $12,000 license fee upon entities operating a telephone exchange. The City asserts that the fee is competitively neutral because it is applied to each and every entity, in exactly the same manner, that wishes to enter the "telephone-exchange" market. Further, the City asserts that the fee does not impede competition because it is based upon the population of the City of Montgomery, which is the maximum potential market for each and every telecommunications provider licensed under the ordinance, if that provider's business is successful. For these reasons, the City of Montgomery asserts that 47 U.S.C. § 253(b) provides a safe harbor for Ordinance No. 48-91.
Additionally, the City notes that § 601 of the FTA expressly includes a "[s]tate tax savings provision," stating:
"[N]othing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede, or authorize the modification, impairment, or supersession of, any State or local law pertaining to taxation, except as provided in sections 622 and 653(a) of the Communications Act of 1934 [sections 542 and 573(c) of this title] and section 602 of this Act [set out as a note under this section]."
See Historical and Statutory Notes to 47 U.S.C. § 152, "Applicability of Consent Decrees and Other Law" (quoting Pub.L. 104-104, Title VI, § 601, Feb. 8, 1996, 110 Stat. 143). The City contends that, under this tax-savings provision, the FTA was never meant to impair a State or municipality's ability to tax entities such as Fast Phones for the privilege of doing business within its jurisdiction.
I agree with the City that § 253(b) is applicable because the State has authorized municipalities to tax entities doing business within its jurisdiction for the purpose of raising revenue. The State has also specifically authorized municipalities to impose the $12,000 license fee upon telephone-service providers. Because this fee applies in exactly the same manner to any entity wishing to enter the telecommunications-provider market, the fee is competitively neutral. For these reasons, I conclude that § 253(b) provides a safe harbor for Ordinance No. 48-91.
Additionally, I find the language of the tax-savings provision unequivocal and applicable to the issue presented. Based upon this unequivocal language, and the fact that an across-the-board business-license fee is not an improper barrier to competition, I believe the trial court properly granted the City of Montgomery's *627 summary-judgment motion. Accordingly, I dissent.
HARWOOD and WOODALL, JJ., concur.
NOTES
[1] This Court denied certiorari review in Dial Tone on June 16, 2000.
[2] Both Fast Phones and the PSC characterized Fast Phones' business as a local telephone "exchange service."
[3] The record reflects that Fast Phones actually purchases services from BellSouth and then offers those purchased services to its customers at prices it sets. Once a customer signs up with Fast Phones, Fast Phones pays BellSouth an amount to cover the first month of telephone service for its customer and to cover any required deposit so that BellSouth will connect telephone services for that customer. A customer who signs up with Fast Phones does not pay BellSouth directly for his or her telephone services; that customer pays Fast Phones directly. Fast Phones is responsible for collecting any unpaid amounts from its own customers.

In turn, Fast Phones receives a bill from BellSouth for all of the telephone services Fast Phones' customers receive, and Fast Phones is liable for paying BellSouth. If Fast Phones' customers do not pay their telephone bills, Fast Phones, not BellSouth, loses money. Thus, Fast Phones is not signing up customers for BellSouth; Fast Phones is signing up its own customers, with the hope that it will make a profit on these accounts.
Moreover, Fast Phones maintains a toll-free telephone number so its customers can report problems with their telephone service; Fast Phones then reports the trouble to BellSouth and requests that BellSouth investigate and correct the problem. Fast Phones' customers do not contact BellSouth directly to report telephone problems. Thus, Fast Phones' customers have no direct contact with BellSouth.